**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO.  06-61527-CIV-DIMITROULEAS/SELTZER

JANE DOE I, JANE DOE II, and JOHN DOE,    )
        )
    Plaintiffs,        )
        )
v.        )
        )
DRUMMOND COMPANY, INC., and    )
DRUMMOND LTD.,    )
        )
    Defendants.        )
        )

**DEFENDANTS'  MOTION TO DISMISS PLAINTIFFS' COMPLAINT**
**AND**
**INCORPORATED MEMORANDUM OF LAW**

George Mencló, Jr., Adolfo E. Jiménez,
Brett A. Barfield & Martha R. Mora
HOLLAND & KNIGHT LLP
Attorneys for Defendants
701 Brickell Avenue, Suite 3000
Miami, Florida 33131
Tel.: (305) 374-8500
Fax.: (305) 789-7799

Defendants Drummond Ltd. ("Drummond Ltd.") and Drummond Company, Inc. ("DCI") (collectively "Defendants"), pursuant to Rules 12(b)(1), (2), (3), (5) and (6) of the Federal Rules of Civil Procedure, move the Court to enter an order dismissing Plaintiffs' Complaint.  The Court should grant this motion for the reasons set forth below.

## INTRODUCTION

Plaintiffs' claims arise out of the alleged murder of Candido José Mendez in February 2001 outside his home in the Cesar province of Colombia by members of a Colombian terrorist group.  At the time of his death, Mr. Mendez was employed by Defendant Drummond Ltd. (the only defendant with operations in Colombia) and was a member of the trade union that represented the work force at Drummond Ltd.'s mining operations.  Plaintiffs' claims are predicated on the outlandish theory that the Colombian military *created* the paramilitaries[1] – recognized terrorist groups – who, in turn, were hired by Defendants to murder Mr. Mendez. Instead of seeking redress in Colombia, where the tragic acts allegedly occurred, Plaintiffs, all of whom are citizens and residents of Colombia, have brought their claims here.  This case has absolutely no connection to this forum.

In addition to several tort claims asserted under Florida law (notwithstanding that ***none*** of the events occurred in Florida), Plaintiffs' principal claims are pursuant to the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"), and the Torture Victim Protection Act, 28 U.S.C. § 1350 ("TVPA"). These federal claims require a showing of "state action," which Plaintiffs seek to supply through a series of conclusory statements linking the paramilitaries with the Colombian government and, in turn, linking the Defendants with the Colombian government.

---

[1]  Specifically, Plaintiffs allege:  "The paramilitaries in Colombia, including those who committed the wrongful acts alleged herein, are *legal creations* of the government of Colombia, and they act with support from and cooperation with the official military."  Compl. ¶ 30 (emphasis added).

1

Plaintiffs' allegations are insufficient to establish "state action" as a matter of law and fail to state a claim for relief under ATS and TVPA.  Plaintiffs ask the Court, in short, to find that the current Colombian government *supported* the very groups that, through years of continuous diplomatic efforts, the United States and Colombian governments have worked together to eradicate—groups both governments have labeled as terrorists.  This assertion also presents a nonjusticiable political question, which is an independent basis for dismissal.  But the Court need not entangle itself in these thorny foreign relations issues because the face of the Complaint shows plainly that this action should be litigated in Colombia.  For these and several additional reasons the Court should dismiss Plaintiffs' Complaint.

The bases for dismissal set forth in this Motion include:

(1)  This inherently Colombian action belongs in Colombia under the doctrine of *forum non conveniens*;

(2)  There is no "state action" in this case, a requirement under both the Alien Tort Statute ("ATS") and Torture Victim Protection Act ("TVPA");

(3)  Resolution of this case inextricably involves a nonjusticiable political question;

(4)  The Court has no jurisdiction over these Plaintiffs, who filed the Complaint under pseudonyms without prior leave of the Court;

(5)  Plaintiffs' tort claims are barred by the applicable statute of limitations or fail to state a claim under the law pleaded;

(6)  Plaintiffs lack standing to assert a wrongful death claim on behalf of Mr. Mendez; and

(7)  As to Drummond Ltd., it has insufficient contacts with Florida to subject it to jurisdiction here, it was improperly served, and venue does not lie in this District.

For each of these reasons, the Court should dismiss the Complaint.

## FACTUAL BACKGROUND

Plaintiffs are citizens and residents of the Republic of Colombia.  Although they filed this action under "Doe" pseudonyms, the Complaint discloses that they are the wife, daughter, and

son, respectively, of Candido José Mendez, a deceased Colombian employee of Drummond Ltd. and member of the trade union at Drummond Ltd.'s coal mine.

Drummond Ltd. is an Alabama limited partnership that conducts its business operations in the Republic of Colombia.  Declaration of Curtis Jones, attached as Exhibit 1, ¶¶ 2, 3 (hereinafter "Jones Decl. at ¶ __").  The company is dedicated principally to mining in Colombia pursuant to a concession granted to it by an agency of the Colombian Ministry of Mines.  *Id.* ¶ 3. It has been operating in Colombia since 1987 and has an extensive integrated operation to extract coal from its mine in the Cesar Province and transport it approximately 200 kilometers to its port facilities in Santa Marta, Colombia.  Drummond Ltd. employs approximately 3,700 workers in Colombia.  *Id.* ¶ 5.  Drummond Ltd. has virtually no contacts with Florida and Plaintiffs allege no connection to Florida in the Complaint.

DCI is an Alabama corporation.  Compl. ¶ 16.  Plaintiffs allege that DCI owns, finances and operates the Drummond Ltd. coal mine operation in Colombia, although they acknowledge that Drummond Ltd. "manages the day-to-day operations" of the coal mining business.  Compl. ¶¶ 16-17.

As described in the Complaint, the alleged events giving rise to this action otherwise occurred almost exclusively in Colombia.[2]  Plaintiffs allege that on February 18, 2001, Mr. Mendez was followed home from work by a truck "commonly used by paramilitary forces," and that the following morning he was called out of his home by thirty men, some "wearing paramilitary uniforms, some police uniforms, and others . . . civilian clothing."  *Id.* ¶¶ 43, 44.[3]

---

[2] The only participation of DCI alleged in connection with the events set forth in the Complaint is that Garry Drummond, DCI's CEO and COO, is said to have attended a 1997 meeting in Alabama with executives of Drummond Ltd., during which he questioned the Drummond Ltd. executives "about how to deal with the 'union problem.'" Compl. ¶ 40.  This also is the only alleged event that occurred outside of Colombia.

[3] This purported connection between the Colombian government and the thirty individuals alleged in 2001 to be paramilitaries who killed Mr. Mendez is beyond attenuated.  Moreover, the 1968 law Plaintiffs cite, "Law 48," in no

The men allegedly asked Mr. Mendez where he worked and, after he responded "at Drummond," the men shot and killed him while his family watched from inside the house.  *Id.* ¶ 45.

Plaintiffs allege that "the paramilitary in Colombia have a mutually-beneficial, symbiotic relationship with the Colombia government's military."  *Id.* ¶ 24; *see also id.* ¶ 30.  In support, Plaintiffs cite the  report of a non-governmental organization ("NGO") that found, in 1999 and 2000, "close ties between the Colombian army and paramilitary groups responsible for gross human rights violations," and an undated, unidentified document purported to emanate from the State Department reporting instances of   "individual members" of the Colombian military collaborating with  paramilitary groups, including sometimes providing them with weapons, intelligence, and supplies.  *Id.* ¶¶ 24, 25.

However, the only allegation in the Complaint that even arguably ties the Colombian government specifically to the murder of Mr. Mendez is that some of the unknown paramilitaries who allegedly committed the murder wore "***police*** uniforms."  *Id.* ¶ 44 (emphasis added).  Yet, nowhere in their seventy-seven paragraph pleading do Plaintiffs allege a relationship between the paramilitaries and the Colombian ***police***.

As set forth more fully in Part III of this Motion, the U.S. State Department has issued a public finding that the Colombian government is taking appropriate action against the paramilitaries.  The Secretary of State concluded that the Colombian armed forces are taking action against officers credibly accused of aiding such groups; cooperating with prosecutors and courts to prosecute and punish such officers; and taking effective measures to sever any links with paramilitary groups.  In fact, the Colombian Ministry of Defense reports that from August 2002 to November 2006, the Colombian authorities captured and jailed almost 24,000 subversive

---

way created or authorized the creation of paramilitary groups and the Colombian Supreme Court has held that such groups "have no legal backing nor are they organized by the public authority."  Arrieta Decl. at ¶ 41 (quoting *en banc* op. of the Colombian Supreme Court rendered May  22, 1989).

persons from the left and right wing terrorist groups, of which approximately 12,764 were part of or had ties to paramilitary groups.   Declaration of Carlos Gustavo Arrieta, Exhibit 2, ¶ 46 (hereinafter "Arrieta Decl. ¶__").   Moreover, there are currently approximately 6,285 cases pending against paramilitaries.  *Id.*

Moreover, in 2005 the Colombian Congress approved The Law of Justice and Peace ("Law 975") to facilitate the reincorporation of members of paramilitary groups and to guarantee the rights of reparation to their victims.  Arrieta Decl. ¶ 48.  As part of this initiative, many of the commanders of the paramilitaries have surrendered and are before the courts for their crimes.  *Id.* "On January 7, 2007, the Office of the Prosecutor General in charge of the application of Law 975 informed in a statement that, as part of the government's program to extinguish the paramilitaries and provide judicial remedies to victims, more than 20,000 victims of past paramilitary violence had presented claims against alleged paramilitaries."  *Id.*

Nevertheless, notwithstanding Law 975 and the many other remedies available to them in Colombia's courts, *see id.* ¶¶ 11-37, Plaintiffs do not allege that they have sought any relief in the courts of Colombia.  Instead, citing several 2002 and 2003 reports from NGOs, they allege in conclusory fashion that they "do not have access to an independent or functioning legal system within Colombia to raise their complaints," and that "[a]ny effort to seek legal redress would be futile because those seeking to challenge official or paramilitary violence . . . are at great risk from retaliation."  Compl. ¶¶ 4-8.  Plaintiffs also make the bare assertion that, "even if there were remedies available to Plaintiffs in Colombia, such remedies are inadequate and would not afford the complete relief available to Plaintiffs by this Complaint."  Compl. ¶ 8.[4]

---

[4] Plaintiffs cite to one 2002 U.S. State Department Country Report on Colombia that reported, "[t]he civilian judiciary is inefficient, severely overburdened by a large case backlog, and undermined by intimidation and the prevailing climate of impunity."  Compl. ¶ 4.  However, in addition to being outdated, for the reasons set out in Part

**ARGUMENT**

The Complaint attempts to state eight causes of action, including claims under the ATS and TVPA based on alleged violations of several conventions, resolutions and treaties, Compl. ¶ 47 (Counts 1, 2, 4, and 5); and claims under Florida law for wrongful death (Count 3); assault (Count 6); intentional infliction of emotional distress (Count 7); and negligent supervision (Count 8). *Id.* ¶¶ 3, 47(l). For the several independent reasons set forth below, all of Plaintiffs' claims are due to be dismissed.

Numerous independent grounds support dismissal of this action, most fundamental of which is the absence of any connection whatsoever with the forum Plaintiffs have chosen. The Court should send this case to Colombia, the forum with the only connection to the facts alleged ant subject matter jurisdiction over Plaintiffs' federal claims because they have failed to sufficiently allege state action, and avoid the precise collateral consequences and foreign relations repercussions the Supreme Court has cautioned federal courts to avoid. *See Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).

## I.   THIS   INHERENTLY   COLOMBIAN   ACTION   BELONGS   IN COLOMBIA UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*

The Court should decline to adjudicate this purely Colombian dispute because "it appears that the convenience of the parties and the court, and the interests of justice indicate that the action should be tried in another forum." *Ford v. Brown*, 319 F.3d 1302, 1307 (11th Cir. 2003). Dismissal on the basis of *forum non conveniens* is appropriate when "(1) an adequate alternative forum is available, (2) the public and private interest factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice." *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1310-11 (11th Cir. 2001). The burdens on

---

I, A., courts have roundly held that such general assertions of deficiency in a foreign court system do not render the foreign forum inadequate.

the parties and the Court in trying this case in Florida are heavy.  On the other hand, litigating this case in Colombia, where the plaintiffs, witnesses and evidence are found, is not inconvenient.

**A.      Colombia Is An Available And Adequate Alternative Forum**

The availability and adequacy of the alternative forum are separate inquiries.  *Leon*, 251 F.3d at 1311 (affirming dismissal to Ecuador); *Da Rocha v. Bell Helicopter Textron, Inc.*, 451 F. Supp. 2d 1318, 1322 (S.D. Fla. 2006) (dismissing case to Brazil).  "[T]he burden of establishing whether an alternative forum exists is not a heavy one."  *Banco Latino*, 17 F. Supp. 2d at 1331-32.  "Ordinarily, this requirement will be satisfied where the defendant is amenable to process in the other jurisdiction."  *Id*.  Additionally, a defendant's submission to the jurisdiction of an alternative forum renders that forum "available."  *Leon*, 251 F.3d at 1311.

If the Court grants this Motion, DCI and Drummond Ltd. agree to waive any objections to the jurisdiction of the Colombian courts, provided Plaintiffs initiate their suit in Colombia within 180 days of a dismissal by this Court.  *See Da Rocha*, 451 F. Supp. 2d at 1322 (conditioning dismissal on agreement by defendants to submit to jurisdiction provided suit filed in Brazil within 180 days following dismissal).  Where a defendant agrees to submit to the jurisdiction of the alternative forum, any "further inquiry into the foreign jurisdictional law really is needless since it is so easily obviated by the use of the typical conditional dismissal device." *Ford v. Brown*, 319 F.3d 1302, 1311 (11th Cir. 2003).   If Plaintiffs are unable to reinstate their case within a reasonable time in Colombia, through no fault of theirs, and the decision is affirmed by the highest court in Colombia, then this action could be reinstated in this Court.  *See*

*Leon*, 251 F.3d at 1316; *Magnin*, 91 F.3d at 1430-31; *Da Rocha*, 451 F. Supp. 2d at 1326-27; *Membreno v. Costa Crociere*, 347 F. Supp. 2d 1289, 1298 (S.D. Fla. 2004).[5]

"An alternative forum is 'presumed adequate unless the plaintiff makes some showing to the contrary.'" *Da Rocha*, 451 F. Supp. 2d at 1322 (quoting *Leon*, 251 F.3d at 1312)). "An adequate forum need not be a perfect forum." *Satz*, 244 F.3d at 1283. Only in rare circumstances where the remedy offered by the other forum is "clearly unsatisfactory" will the alternative forum be found inadequate. *Leon*, 251 F.3d at 1311. Plaintiffs' bare assertion that, "even if there were remedies available to Plaintiffs in Colombia, such remedies are inadequate and would not afford the complete relief available to Plaintiffs by this Complaint," Compl. ¶ 8, is entirely refuted by Dr. Arrieta's declaration.

Plaintiffs have numerous causes of action and remedies available to them in the Colombian courts. Arrieta Decl. at ¶12. Plaintiffs may bring, based on the same facts alleged in their Complaint, claims against Defendants in various Colombian courts and, if such claims are found to be meritorious, obtain damages as relief. *Id.* They may institute civil proceedings against Defendants to recover damages for the losses they allege; and they may institute administrative proceedings for damages against the Colombian government for any alleged breach of the government's duty to protect them. *Id.* at ¶¶ 33-44. They may also intervene in any criminal proceeding and seek civil damages from the defendant in the criminal proceeding. *Id.* at ¶¶ 13-32. All final decisions will be appealable to higher courts by the losing party. *Id.* at ¶ 17. These available proceedings and the remedies they afford constitute substantially more

---

[5] Defendants would not waive their rights to assert proper defenses to the action at that time, however, such as lack of personal jurisdiction and improper venue, as argued in this Motion.

than "no remedy at all."[6]  *See, e.g., Da Rocha*, 451 F. Supp. 2d at 1322; *Bautista v. Cruise Ships Catering & Serv. Int'l, N.V.*, 350 F. Supp. 2d 987, 991 (S.D. Fla. 2004) (Dimitrouleas, J.) ("The Court does not conclude that Colombian Courts are incapable of providing their citizens with justice.").

Plaintiffs do not allege that they have sought any relief in the courts of Colombia. Instead, relying on NGO reports and one State Department Country Report dating back several years, they allege in conclusory fashion that they "do not have access to an independent or functioning legal system within Colombia to raise their complaints," and that "[a]ny effort to seek legal redress would be futile because those seeking to challenge official or paramilitary violence . . . are at great risk from retaliation."  Compl. ¶¶ 4-8.  But Plaintiffs' conclusory assertions about Colombia's legal system are insufficient.  ""[E]xtreme amounts of partiality or inefficiency" are required.  *Leon*, 251 F.3d at 1310, 1312 (plaintiff must substantiate allegations of serious corruption or delay).  Moreover, "considerations of comity preclude a court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards, so such a finding is rare."  *PT United Can Co., Ltd., v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 73 (2d Cir. 1998).  "[T]he argument that the alternative forum is too corrupt to be adequate 'does not enjoy a particularly impressive track record.'"  *Leon*, 251 F.3d at 1311-12 (quoting *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1084 (S.D. Fla. 1997)).

In the adequacy analysis, a plaintiff's concern for his or her safety may be given consideration, but only in extreme situations and where the possibility of harm is significant,

---

[6] While not dispositive of the adequacy question, courts may consider in the analysis that other courts have also found the same foreign forum to be adequate.  Colombian courts have been found available and adequate in dismissing cases to that jurisdiction on *forum non conveniens* grounds in several cases.  In addition to this Court's decision in *Bautista*, see also *Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8, 14 (1st Cir. 2000); and In re *Bridgestone/Firestone, Inc., Tires Prod. Liability Litig.*, 190 F. Supp. 2d 1125, 1134 (S.D. Ind. 2002).

particularized, and not mere "unsubstantiated speculation." *Shields v. Mi Ryung Constr. Co*, 508 F. Supp. 891, 896 (S.D.N.Y. 1981). *See also Duha v. Agrium, Inc.*, 340 F. Supp. 2d 787, 794 (E.D. Mich. 2004) (same).[7]   The Plaintiffs' concern for their safety in Colombia is merely unsubstantiated speculation and this is evident from the only allegation in Plaintiffs' Complaint that calls into question their safety in Colombia.   Plaintiffs assert that, "if they were identified as bringing this action to challenge and seek compensation for the assassination of Mendez by paramilitary forces in the Cesar Province, they would be at imminent risk of violent retribution, including murder, by these same forces . . . ."  Compl. ¶ 15.

But despite filing under pseudonyms, the caption and allegations of Plaintiffs' Complaint clearly disclose that they are the wife, daughter and son of Candido José Mendez.  Compl. ¶¶ 12-14.  Plaintiffs' pursuit of an anonymous filing is a ploy to help them forum shop and overcome the fact that Colombia is an adequate alternative forum.   There was and would be no greater risk of retaliation from instituting this action in Colombia than in this forum.   Court proceedings in the federal district courts are a matter of public record, and federal dockets are available on the internet.   Plaintiffs' identity is thus easily ascertainable by anyone who reads the Complaint they filed, including by someone in Colombia, where they reside.   By contrast, dockets and court filings in Colombian judicial proceedings are not available electronically.   Arrieta Decl. ¶ 19. Thus, ironically, Plaintiffs likely would have furthered their interest in anonymity by proceeding

---

[7]   While defendants have the ultimate burden of persuasion on all elements of the forum non conveniens motion, on aspects of adequacy of the alternative forum such as corruption and delay, the plaintiff bears the burden to produce "significant evidence" of corruption and delay that would render the alternative forum inadequate.   Only then must the defendant "persuade the District Court that the facts are otherwise." *Leon*, 251 F.3d at 1312-13.   Although we have identified no cases directly addressing the question, this same burden-shifting approach would apply to allegations of extreme safety concerns that the court might consider in its adequacy determination.   This is consistent with the Eleventh Circuit's position that the foreign forum is "'presumed adequate unless the plaintiff makes some showing to the contrary.'"  *Da Rocha*, 451 F. Supp. 2d at 1322 (quoting *Leon*, 251 F.3d at 1312)). *See also Turedi v. Coca Cola Co.*, --- F. Supp. 2d ---, 2006 WL 3187156, *16 (S.D.N.Y. Nov. 2, 2006) ("The proferred alternative forum may be inadequate, for example, where **the plaintiff demonstrates** that he would encounter exceptional . . . barriers in litigating in the other forum, such as the prospect of execution . . . .") (emphasis added).

in Colombia rather than in the United States.  *See also Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8, 13-14 (1st Cir. 2000) (affirming finding of insufficient evidence that travel to Colombia by a former Colombian resident would be perilous).

**B.     The Private Interest Factors Favor Dismissal To Colombia**

Relevant considerations for the private interests of the parties include "the relative ease of access to sources of proof, availability of compulsory process for attendance of unwilling, and the cost of obtaining the attendance of willing, witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive."  *Piper Aircraft*, 454 U.S. at 241 (quoting *Gilbert*, 330 U.S. at 508).  *See also Leon*, 251 F.3d at 1314.

**1.     The Foreign Plaintiffs' Choice of Forum Is Entitled To Minimal Deference**

Although a plaintiff's choice of forum generally is entitled to deference, "the presumption that a plaintiff has chosen a sufficiently convenient forum 'weakens' when the plaintiff is a foreigner litigating far from home."  *Leon*, 251 F.3d at 1314-15; *Ford v. Brown*, 319 F.3d 1302, 1307 (11th Cir 2003).  *See also Bautista v. Cruise Ships Catering & Serv. Int'l, N.V.*, 350 F. Supp. 2d 987, 990 (S.D. Fla. 2004) (Dimitrouleas, J.) ("a weaker presumption applies when the case is brought by a foreign plaintiff").  Here, Plaintiffs all are residents and citizens of Colombia.

The result is unchanged where as here, the action presents international law claims under the ATS or otherwise, and the plaintiffs, as here, are all foreign residents and citizens.  *See Turedi v. Coca Cola Co.*, --- F. Supp. 2d ---, 2006 WL 3187156, *14-15 (S.D.N.Y. Nov. 2, 2006) (dismissing action in which plaintiffs asserted ATS claims to Turkey, where plaintiffs resided, events occurred, and substantial evidence would be found).[8]  "[C]ourts have applied *forum non*

---

[8] One rationale for this rule is that "a plausible likelihood exists that the selection was made for forum-shopping reasons."  *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001). The only connection this action has to

*conveniens* analysis to cases involving claims brought under the ATCA in essentially the same manner as applied to all other cases." *Aguinda v. Texaco*, 142 F. Supp. 2d 534, 553 (S.D.N.Y. 2001), *aff'd as modified,* 303 F.3d 470 (2d Cir 2002).  *See also* In re *Estate of Ferdinand E. Marcos Human Rights Litig.*, 978 F.2d 493, 500 (9th Cir. 1992) ("Such limitations as venue and the doctrine of *forum non conveniens* are available in [ATS] cases as in any other."); *Flores v. S'ern Peru Copper Corp.*, 253 F. Supp. 2d 510, 529-31 (S.D.N.Y. 2002) (same).  Nevertheless, even if the presence of ATS and TVPA claims altered the level of deference accorded Plaintiffs' choice of forum, as explained in detail below, the private and public interest factors tilt so strongly in favor of litigating this case in Colombia that dismissal is required.

## 2. Virtually All Witnesses And Evidence Are Located In Colombia

"Perhaps the most important 'private interest' of the litigants is access to evidence." *Ford*, 319 F.3d at 1308.  Relevant considerations include location of material witnesses, availability of compulsory process for attendance of unwilling witnesses, cost of obtaining willing witnesses, and access to proof.  *Leon*, 251 F.3d at 1314.  Plaintiffs allege that Mr. Mendez was murdered in front of his home in Colombia, and that his family, presumably including Plaintiffs, witnessed the crime.  Compl. ¶ 45.  Plaintiffs allege that Colombian paramilitaries, acting at the behest of Defendants and as an arm of the Colombian military, committed the murder in order to further Defendants' business interest in ridding themselves of the Colombian trade union of which Mr. Mendez was a member.  Compl. ¶ 3.  For Plaintiffs to prove and for Defendants to disprove these allegations, the parties will need testimony from those present at the scene of the events; evidence of Defendants' alleged role in the activities of the paramilitaries and the Colombian

---

Florida is that Plaintiffs' counsel is here.  The nonexistent relationship between Plaintiffs' claims and Florida, and the lack of any connection between Plaintiffs and Florida, reflects a plausible likelihood that Plaintiffs (or their lawyer) selected Florida for forum-shopping reasons.

military; and testimony and evidence concerning the degree to which Defendants exercised control over those who allegedly carried out the murder, among other issues. Much of the evidence will be confidential and/or not readily accessible. All or substantially all of these material witnesses and evidence will be found in Colombia outside the Court's jurisdiction and with no ability to subpoena anyone who witnessed or was involved in the murder. *See Linder v. Calero Portocarrero*, 747 F. Supp. 1452, 1465-66 (S.D. Fla. 1990). None of the witnesses and none of the proof are in Florida, where this Court sits.[9] *Da Rocha*, 451 F. Supp. 2d at 1323 (although numerous witnesses and documents were in the United States and Canada, none of them were in the Court's jurisdiction).[10] Based on the quantity and nature of the evidence likely to be relevant in this case, the parties will have far greater access to proof in Colombia and the parties would be severely prejudiced if forced to litigate in this forum. *See Da Rocha* 451 F. Supp. 2d at 1324. *See also Flores,* 253 F. Supp. 2d at 541 ("The principal fact witnesses, including plaintiffs and the defendant's operating personnel, are in Peru; many of the witnesses, again including plaintiffs, speak only Spanish; most if not all of the pertinent documents are in Peru, and all documents in the Peruvian governments files and virtually all of the operating documents in the Company's files would be in Spanish . . . ."); *Sigalas*, 776 F.2d at 1520 (witnesses in foreign country not subject to process of U.S. court); *Callasso v. Morton & Co.*,

---

[9] While there may be a handful of relevant witnesses and documents at Defendants' offices in Birmingham, Alabama, those witnesses and documents are as easily transported to Colombia as to Florida.

[10] Plaintiffs allege that a meeting occurred at DCI's headquarters in Alabama in 1997, four years before the murder of Mr. Mendez, during which certain staff "advocated 'getting rid of the union." Compl. ¶ 40. But this conduct that allegedly occurred in the United States, and the witnesses and documents associated with it, pales by comparison to the overwhelming contacts of the litigation with Colombia, and evidence and witnesses located there. *See Turedi*, 2006 WL 3187156, at *19 (finding evidence in the U.S. connected to allegations that American corporations directed events that resulted in attack on plaintiffs by Turkish police paled in comparison to the "magnitude of the factual and legal links of the case to Turkey").

324 F. Supp. 2d 1320, 1331 (S.D. Fla. 2004) (expense associated with translating documents from Spanish to English significant).

The cost of obtaining the attendance of willing witnesses and of translating documents if this case were tried here would greatly exceed the comparable cost in Colombia.  The "cost for witnesses to attend trial will be significantly lessened if trial is held in [Colombia]." *Alfadda v. Fenn,* 159 F.3d 41, 47 (2d Cir. 1998); *BCCI Holdings (Luxembourg) Societe Anonyme v. Mahfouz*, 828 F. Supp. 92, 98 (D.D.C. 1993).  *See also Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1430 (11th Cir. 1996) (expense of bringing foreign non-party witnesses to the United States favors dismissal).  The private interest factors heavily favor dismissal to Colombia.

**C.      Public Interest Factors Favor Dismissal To Colombia**

The Court's analysis of the public interest factors includes, (1) "the sovereigns' interests in deciding the dispute"; (2) "the administrative burdens posed by trial"; and (3) "the need to apply foreign law." *Satz*, 244 F.3d at 1284.  All these factors, like the private interest factors, mandate dismissal to Colombia in this case.

> **1.      Colombia Has A Great Interest In This Dispute While The United States Has Virtually No Interest**

"[C]ourts necessarily must analyze the interest that the foreign country has in the dispute, an analysis that may raise issues of international comity." *Ford*, 319 F.3d at 1307.  *See also Esfeld v. Costa Crociere*, 289 F.3d 1300, 1312 (11th Cir. 2002) (same); *Piper*, 454 U.S. at 260 (same).  Moreover, "[t]here is a local interest in having localized controversies decided at home. . . .  In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the [world] where they can learn of it by report only." *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1104

(11th Cir. 2004). "[I]t is clear that a sovereign has a very strong interest when its citizens are allegedly victims and the injury occurs on home soil." *Id.* at 1101.

That the Colombian government has a greater interest in this dispute than the United States is hardly debatable. Every fact alleged in the Complaint occurred in Colombia, with the exception of a single meeting alleged to have occurred (with Colombian citizens in attendance) in Alabama. Compl. ¶ 40. Not a single event occurred in Florida. Most importantly, Plaintiffs allege that the Colombian government created and colluded with the Colombian paramilitaries to extinguish labor union activities, and that defendant Drummond Ltd.—in Colombia—took advantage of this supposed collusion to use the allegedly state-sponsored Colombian paramilitaries as agents to murder one of its Colombian employees. Thus, the analysis of Colombia's interest in this case clearly raises significant issues of international comity. In such situations, courts give heavy weight to the foreign forum's substantially greater interest. *Cf. Turedi v. Coca Cola Co.*, 2006 WL 3187156, *12 (S.D.N.Y. Nov. 2, 2006) ("[T]hese issues fall within the realm of political and public policy questions beyond the proper domain of our courts. In consequence, not infrequently, when they arise in the context of forum non conveniens analysis, the circumstances weigh heavily in favor of dismissal of the actions."); *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1084 (S.D. Fla. 1997) (" [E]ntertaining plaintiffs' claims will involve this Court in sitting in judgment upon the alleged corruption of a nation's entire legal system. If Bolivia's courts do not have a surpassingly greater interest in their own integrity than do the American courts, then the public interest factor is meaningless.").[11]

---

[11] The court in *Eastman Kodak* ultimately denied dismissal because the plaintiff produced substantial and particularized evidence of an imminent threat of harm in Bolivia and corruption in its courts. *Id.* at 1086-87. The plaintiff's representative had previously been imprisoned in Bolivia based on allegedly false accusations made by the defendant to a Bolivian judge who was a relative of the defendant's principal. *Id.*

The Colombian government's interest in this case is heightened by the fact (as alleged by Plaintiffs) that Defendants "utilize the services of the Colombian military to protect its mining facilities, railway lines and U.S. workers in Colombia"; and that Defendants "support a military base on company property by providing the land, as well as electricity, fuel, and equipment." Compl. ¶ 38.  The alleged relationship between Defendants and the Colombian government is significant in the analysis of the public interest factors and further demonstrates Colombia's superior interest in this dispute.  *See Banco Latino*, 17 F. Supp. 2d at 1333 (Venezuela had substantial interest in case where complaint implicated Venezuelan government, Venezuelan banks and companies, and Venezuelan citizens as victims and perpetrators); *Mendes  Junior Int'l Co. v. Banco do Brasil, S.A.*, 15 F. Supp. 2d 332, 340-41 (S.D.N.Y. 1998) (public interest factors strongly favored dismissal to Brazil where contract at issue was in furtherance of Brazilian government's foreign policy and Brazilian government had facilitated relationship).

The issues Plaintiffs raise significantly impact numerous areas critical to the Republic of Colombia.  They touch Colombia's mining industry and the conduct of a private entity operating in this highly regulated area, and affect a major union and its labor relations.  The allegations also reverberate on Colombia's efforts to extinguish the paramilitaries and guerillas and on the laws Colombia has enacted to return the nation to peace.  In contrast, Florida has absolutely no connection to the facts alleged and the United States is connected only because both defendants are Alabama entities.  *See Kamel v. Hill-Rom Co., Inc.*, 108 F.3d 799, 804-05 (7th Cir. 1997) (finding the United States had merely a "passing interest" in dispute where "a foreign plaintiff who was injured in a foreign land filed suit against an American defendant with extensive foreign dealings").  The public interest factors heavily favor dismissing this purely Colombian dispute to Colombia.

**2.      The Administrative Burdens Of Litigating This Colombian Dispute In Florida Are Substantial And Unjustified**

Where, as here, the United States' interests in a dispute are minimal or non-existent, the administrative burdens will weigh in favor of *forum non conveniens* dismissal. *See Chierchia v. Treasure Cay Servs.*, 738 F. Supp. 1386, 1389 (S.D. Fla. 1990) (South Florida would have little interest in litigation by foreign plaintiff against New York defendant when accident occurred abroad). Relevant considerations include the burden a case will place on the Court's limited judicial resources, tax dollars that will be consumed, and the burden on the jury in a forum that has little, if any, connection to the underlying dispute. *See Homen v. M/V SCM Tepuy II*, 2006 WL 3626301, at *9 (S.D. Fla. Aug. 2, 2006) ("There is no need for Florida citizens to serve on a jury when Florida has no local interest in the litigation."). Litigating this case in Florida would impose extremely heavy burdens on this Court, the jury to be summoned, and the parties and witnesses, when the forum has absolutely no nexus to the dispute. "The burden of imposing jury duty on citizens to decide a case with no connection to the forum is a significant factor in performing a *forum non conveniens* analysis." *Da Rocha*, 451 F. Supp. 2d at 1325. *See also Sigalas*, 776 F.2d at 1519 (citing *Gilbert*, 330 U.S. at 508-09).[12]

---

[12] Another important factor in the public interest analysis is "the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law." *Da Rocha*, 451 F. Supp. 2d at 1325. Although Plaintiffs have asserted federal claims under ATS and TVPA, they have also asserted several tort claims. Although stated in the Complaint as Florida and Colombian tort claims, if the action remains here the Court must decide what Colombian law is and compare it to United States law to determine whether a conflict exists. If it does, the Court must apply Florida choice of law rules, including—for the tort claims—the significant relationship test. *See Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980) (adopting Restatement  (Second) of Conflict of Laws § 145 (1971), which states the so-called "significant relationship test" for choice of law). In that event, because Plaintiffs and their decedent are Colombian, the alleged murder occurred in Colombia, and defendant Drummond Ltd. has all of its operations in Colombia where the decedent worked, it is likely that Colombian law will apply to issues of liability and damages. *See Sibaja v. Dow Chem. Co.*, 757 F.2d 1215, 1218 n.5 (11th Cir. 1985) (affirming *forum non conveniens dismissal* where, as here, the trial court concluded it would be forced "to conduct a complex exercise in comparative law and consider a foreign law with which the Court is not familiar and which is in a foreign language."). The presence of claims for alleged international law violations is a factor neither favoring nor disfavoring either forum. As Dr. Arrieta states, human rights recognized by international law are fundamental rights protected in Colombia and its courts. Arrieta Decl. ¶ 35. *See also Adamu v. Pfizer, Inc.*, 399 F. Supp. 2d 495, 505

II.     **THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE PLAINTIFFS' COMPLAINT FAILS TO PLEAD THE "STATE ACTION" REQUIRED BY THE ATS AND TVPA**

Plaintiffs' claims for extrajudicial killing and torture under both the ATS and TVPA, Compl. ¶¶ 2, 47-55, 60-65, fail as a matter of law to sufficiently plead state action.  The Court thus lacks subject matter jurisdiction over these claims.  State action is a necessary element for claims under ATS and TVPA.  *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir. 2005).[13]  Plaintiffs thus contend that the unknown and unnamed paramilitaries whom they claim committed the alleged wrongful acts are creations of the Colombian government and enjoy a symbiotic relationship with the Colombian military, such that actions of the paramilitaries constitute actions of the Colombian state for purposes of ATS.[14]  Plaintiffs then posit that state action attaches to Defendants because Defendants' "employees and/or agents" allegedly acted jointly with the paramilitaries.[15]  Plaintiffs' state action theory not only

---

(S.D.N.Y. 2005) (dismissing action presenting, *inter alia*, ATS claims and noting that, "[b]ecause Plaintiffs assert claims under international law, any concerns regarding the difficulty in applying foreign law are not present here").

[13] Notwithstanding Plaintiffs' allegations of civil war and genocide, Compl. ¶¶ 22, 34, a finding of state action is absolutely required in this case because Plaintiffs' claims are based on allegations that the tortious actions alleged in the Complaint were committed in furtherance of "**business interests** and activities" rather than in furtherance of war hostilities.  Compl. ¶¶ 19-20 (emphasis added).  Compare *Kadic v. Karadz I*, 70 F.3d 232, 239 (2d Cir. 1995) (no state action is required if the conduct constitutes a war crime); with *In re Sinaltrainal Litig.*, No. 01-3208-CIV-Martinez/Banstra, at 25-26 (S.D. Fla. Sept. 29, 2006) (state action required where plaintiffs alleged that the tortious actions were committed in connection with and in furtherance of defendant's business interests and activities, rather than in furtherance of war hostilities).

[14] Plaintiffs allege that "[t]he close, symbiotic relationship between the military and paramilitaries in Colombia is such that the paramilitaries are acting under color of the authority of the government of Colombia" and that "[t]he paramilitaries in Colombia, including those who committed the wrongful acts alleged herein, are legal creations of the government of Colombia, and they act with support from and cooperation with the official military."  Compl. ¶ 30.  *See also* Compl. ¶¶ 24-25 (alleging that the paramilitaries in Colombia have a mutually-beneficial, symbiotic relationship with Colombia's military); ¶ 38 (asserting that Colombian military cooperate with the paramilitaries); and ¶ 39 (alleging that the "paramilitaries are permitted to operate openly in and around the Drummond facilities in Colombia because they are in a cooperative and symbiotic relationship with the regular military that are stationed on Drummond's property.").

[15] *See, e.g.*, Compl. ¶ 49 (alleging that "Defendant companies' employees and/or agents engaged in joint action with, and/or conspired with, paramilitary forces that were operating under color of law")

defies logic but also constitutes an effort to create "state action" where none may be found as a matter of law.[16]

Plaintiffs' theory of state action is in direct conflict with *Sosa v. Alvarez-Machain*, the most recent pronouncement by the Supreme Court on the limitations of ATS jurisdiction.[17]   In *Sosa*, the Court concluded that Congress enacted ATS with the understanding that federal courts would use their common law powers to recognize causes of actions for a "modest number of international law violations."  542 U.S. at 724.  The Court held that federal courts should assert jurisdiction over only a "narrow class" of international law violations that are comparable to violations of norms "of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th century paradigms" upon which the statute was based.  *Id.* at 725.[18]  The Court also stated that the ***scope*** of liability is also circumscribed by well-defined international law norms.  *Id.* at 733 n.20.  The Court warned the federal courts to exercise restraint and great caution in evaluating whether claims under ATS do in fact implicate this "narrow class" of international law violations.  *Id.* at 727-28.

---

[16] The Eleventh Circuit has closed the door on the notion that the actions of terrorists or other non-governmental armed groups, even when allegedly *tolerated* by the state, are "state actions" sufficient to support ATS and TVPA jurisdiction.  *Aldana*, 416 F.3d at 1248 (holding that Guatemala's registration and toleration of private security forces did not transform those forces' acts into state acts).

[17] It is well-settled that the requirement of state action is a jurisdictional requirement.  *See Filartiga v. Pena-Irala*, 630 F.2d 876, 887 (2d Cir. 1980) ("The paucity of suits successfully maintained under [the ATS] is readily attributable to the statute's requirement of alleging a 'violation of the law of nations' at the jurisdictional threshold. Courts have, accordingly, engaged in a more searching preliminary review of the merits than is required, for example, under the more flexible 'arising under' formulation."); *Kadic*, 70 F.3d at 238 ("[I]t is not a sufficient basis for jurisdiction to *plead merely a colorable violation* of the law of nations.  There is no federal subject-matter jurisdiction under the Alien Tort Act unless the complaint adequately pleads a violation of the law of nations (or treaty of the United States).").  Indeed, these cases have been interpreted as mandating a heightened pleading standard for ATS cases to establish a court's jurisdiction.  *See, e.g.,* In re *Sinaltrainal Litig.*, No. 01-3208-CIV-Martinez-Banstra, at 2 n.4 (S.D. Fla. Sept. 29, 2006) (dismissing action with prejudice for failure to plead state action with sufficient particularity).  *See also Aldana*, 416 F.3d at 1247 ("Pleadings must be something more than an ingenious academic exercise in the conceivable.") (citations and quotations omitted).

[18] The Court recognized that "violation of safe conducts, infringement of the rights of ambassadors, and piracy" were the only causes of action recognized as violations of the law of nations when Congress enacted the ATS in 1789.  *Sosa*, 542 U.S. at 724.

With *Sosa*'s limiting parameters as a backdrop, the majority of suits brought under ATS and TVPA resonate from a common chord:  they are actions against either named individuals who undoubtedly were themselves state actors, as officers or as agents of foreign political entities, *see, e.g., Abebe-Jira v. Negewo*, 72 F.3d 844 (11th Cir. 1996) (torture victims sued former chairman of Ethiopian governing unit alleged to have personally supervised and participated in acts of torture), or private parties alleged to have engaged in joint action with acknowledged state actors, *see, e.g., Sarei v. Rio Tinto, PLC.*, 456 F.3d 1069, 1078-79 (9th Cir. 2006) (defendant mining corporation allegedly participated with the army of Papua New Guinea in attacks on civilians); *Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) (defendant corporations alleged to have directed and aided the Nigerian Government's terror attacks).  Unable to establish state action under one of these direct or joint action theories, Plaintiffs attempt to stretch ATS jurisdiction beyond these recognized and principled limits. Plaintiffs ask this Court to expand the concept of state action to include "a novel theory that 'color of law' can be imputed from complicity between state entities [i.e. the Colombian state] to paramilitaries, and in turn from paramilitaries to the Defendants in this case."  In re *Sinaltrainal Litig.*, No. 01-3208-CIV-Martinez-Banstra, at 2 n.4 (S.D. Fla. Sept. 29, 2006) ("*Sinaltrainal*") (Copy attached as Exhibit 3).

Judge Martinez' recent opinion in *Sinaltrainal* merits attention because of the striking similarity of the allegations in that case with those in the instant action.[19]   The state action

---

[19] Except for the substitution of Mendez' name, the Plaintiffs' allegations track the language of the allegations in the *Sinaltrainal* Complaints.  *Compare Sinaltrainal.*, Case No. 01-3208-CIV-Martinez/Banstra, at 36 n.27 (the *Gil* Complaint, Case No. 01-3208, alleged that through "Defendants' employee and/or agent, Mosquera [the Coca-Cola bottling plant manager], engaged in joint action with, or conspired with, paramilitary forces that were operating under color of law, and, so acting, murdered Isidro Gil.  Further, through their employees and/or agents, including Mosquera, Defendants knowingly aided and abetted the paramilitary forces that murdered Isidro Gil by providing financial support, supplies, access, and other substantial assistance that contributed to the ability of the paramilitary forces to murder Isidro Gil.")  *with* Compl. ¶ 49 (Plaintiffs allege that "the Defendant companies' employees and/or agents engaged in joint action with, and/or conspired with, paramilitary forces that were operating under color of

allegations in *Sinaltrainal* rested on the same theory Plaintiffs assert here.  Like Plaintiffs here, the plaintiffs in *Sinaltrainal* asserted that "the defendant corporations and individuals are vicariously liable, through theories of conspiracy, aiding and abetting, or joint action, for the violent actions of paramilitary members [who were alleged to be operating under "color of law"]—whose actions should be imputed to the Republic of Colombia—in an attempt to intimidate union members and squelch union activity." *Id.* at 5-6, 8.  Judge Martinez described this theory under which "'color of law' can be imputed from complicity between state entities to paramilitaries, and in turn from paramilitaries to the Defendants," as "unprecedented," "novel," and "untested in any federal court." *Sinaltrainal*, Case No. 01-3208-CIV-Martinez/Banstra, at  2 & n.4.

Such an enlargement of the concept of state action is unwarranted and impermissible because it stretches the boundaries of "color of law" jurisprudence, and thus of ATS jurisdiction, beyond any well-defined international law norm.  In *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984), Judge Edwards, concurring in the dismissal of an ATS claim, found that the Palestine Liberation Organization ("PLO") was not a recognized member of the community of nations and thus did not act under color of any state's law.[20]  Judge Edwards declined to extend the definition of "state actor" under the law of nations "absent direction from the Supreme Court." *Id.* at 792.  That direction came in *Sosa*.

---

law, and so acting, murdered Mendez.  Further, through their employees and/or agents, Defendant companies knowingly aided and abetted the paramilitary forces that murdered Mendez by providing financial support, supplies, access, and other substantial assistance that contributed to the ability of the paramilitary forces to murder Mendez."). *Compare also* Gil Compl. ¶ 38 ("The paramilitaries that Mosquera conspired with were . . . functioning openly in Carepa out of the military base . .  and were supported by and received cooperation from the military and police forces in the area such that the paramilitaries were in a symbiotic relationship with the military and police forces in the area.") *with* Compl. ¶ 39 ("These AUC paramilitaries are permitted to operate openly in and around the Drummond facilities in Colombia because they are in a cooperative and symbiotic relationship with the regular military . . . .").

[20] As noted earlier, under Eleventh Circuit precedent, the paramilitaries in this case are likewise not state actors for ATS jurisdictional analysis. *Aldana*, 416 F.3d at 1248.

*Sosa* also held that "whether international law extends the scope of liability for a violation of a given norm" to the defendant being sued is a consideration related to the question of whether the international norm allegedly violated is "sufficiently definite to support a cause of action." 542 U.S. at 732-33 & n.20.  Following this directive, some federal courts after *Sosa* have reexamined the applicability of "color of law" jurisprudence in determining whether to extend liability under the ATS to non-state actors.  Finding that "the 'color of law' jurisprudence developed under § 1983 is not a well developed international norm," these courts have held its application to be an unwarranted expansion of the ATS's reach and  inconsistent with the Supreme Court's "repeated calls for judicial restraint."  *Bowoto v. Chevron Corp.*, 2006 WL 2455752, at *6 (N.D. Cal. Aug. 22, 2006).  *See also Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 26 (D.D.C. 2005) ("Grafting § 1983 color of law analysis onto international law claims would be an end-run around the accepted principle that most violations of international law can be committed only by states.").  These courts in the post-*Sosa* context have refused even to extend liability to private parties such as corporations who act *jointly* with an acknowledged state actor.  *See Bowoto*, 2006 WL 2455752, at *7 (refusing to hold defendant oil corporations liable for the acts of the Nigerian military under a "color of law" analysis).[21]

Here, as we have noted, Defendants are not alleged to have acted jointly with state actors, but with paramilitaries who, like the PLO in *Tel-Oren*, are clearly not state actors.  There is *no* authority for stretching the color of law analysis, as Plaintiffs urge here, to attach ATS liability to a private actor (Drummond Ltd.) alleged to have acted jointly with a **non**-state actor (the paramilitaries) alleged, in turn, to have acted with support from a state actor (the Colombian

---

[21] Judge Martinez acknowledged but did not address this line of cases but, instead, concluded that the plaintiffs' allegations were "too conclusory, too vague, and too attenuated to adequately plead a violation of the law of nations."  *Sinaltrainal*, No. 01-3208-CIV-Martinez-Banstra, at 4, 25, 33.

military).[22]   There is no justifiable reason for this Court to expand the reach of the ATS beyond the well-defined paradigms recognized in *Sosa* by expanding the definition of a state actor in order to create a new theory of liability under the law of nations.   This Court should decline to accept the Plaintiffs' invitation to fling open the door that *Sosa* left barely ajar.   *Sosa*, 542 U.S. at 727-29.

### III.   RESOLUTION OF THIS CASE INEXTRICABLY INVOLVES A NONJUSTICIABLE POLITICAL QUESTION

Even if the Court *could* entertain this suit, it should exercise its discretion not to.   In *Sosa*, the Supreme Court warned that "attempts by federal courts to craft remedies for the violations of new norms of international law would raise risks of adverse foreign policy consequences, they should be undertaken, if at all, with *great caution*."   *Id.* at 727-28 (emphasis added).   The government of Colombia is friendly to the United States, and indeed has been described as "one of the United States' closest allies in this hemisphere, and our partner in the vital struggles against terrorism . . . ."   *Supplemental Statement of Interest of the United States*, *Mujica v. Occidental Petroleum Corp., Inc.*, No. CV03-2860-WJR(JWJx) (Jan. 5, 2005) (attached as Exhibit 4).[23]   The Colombian government receives millions of dollars in aid from the United

---

[22] We acknowledge that the Eleventh Circuit recently stated that courts look to "principles of agency law and [] jurisprudence under 42 U.S.C. § 1983" in construing the state action requirement of the ATS.  *Aldana*, 416 F.3d at 1247.  However, the court did not discuss—and it appears the parties did not raise—the effect of *Sosa* on the continuing validity of color of law analysis after *Sosa*.  In fact, in support of the proposition that principles of § 1983 guide the state action inquiry, the court cited *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995), a case that predates *Sosa* by some nine years.  Moreover, *Aldana* involved the well-recognized variety of vicarious liability, in which a private party is alleged to have acted **directly** with a state actor.  *See Aldana*, 416 F.3d at 1250 (private company alleged to be liable for the violent acts of police officers and government officials).  *Aldana* thus does not mandate that the Court find here that Plaintiffs have sufficiently pled state action. As Judge Martinez observed, the Eleventh Circuit has not squarely addressed the arguments made in the line of post-*Sosa* cases rejecting color of law jurisprudence as insufficiently defined in international law.  *Sinaltrainal*, No. 01-3208-CIV-Martinez-Banstra, at 33 n.26.

[23] *See also Remarks on the Future of U.S. Policy in Colombia For the Inter-American Dialogue*, R. Nicholas Burns, Under Secretary for Political Affairs, United States Department of State (Aug. 3, 2005), available at http://www.state.gov/p/us/rm/2005/50728.htm ("[The] United States has a very close partner in Colombia . . . .  We

States to be used in its effort to eradicate the paramilitaries, pursuant to findings of the Executive and Legislative Branches of the United States government that the Colombian government respects human rights and is actively attempting to eliminate the paramilitaries.[24]  For this Court to hold, as Plaintiffs ask, that the Colombian government in fact *created* the paramilitaries, and acts *in collusion with them* – a finding this Court would have to make to allow this action to proceed based on Plaintiffs' novel theory – would be directly contrary to the findings of both the State Department and Congress.  This is precisely the type of case in which *Sosa* warned courts to exercise restraint because of the serious "collateral consequences" and "potential implications for the foreign relations of the United States." *Sosa*, 542 U.S. at 727-28 (cautioning that collateral consequences is itself a reason for a high bar to new private causes of action for violating international law).[25]

The high risk of collateral consequences and foreign relations repercussions accompanying this action resolves any doubt that this matter is nonjusticiable.   "The nonjusticiability of a political  question is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962).  In *Baker*, the Court recognized six factors, any one of

---

have no better partner in Latin America. . . .  President Uribe is one of our strongest allies, and U.S. support . . . has enabled the Uribe government to continue to make great strides against narcotraffickers and terrorist.").

[24] "The United States strongly supported Plan Colombia's objectives . . . with a $1.3 billion assistance program enacted in July 2000. . . .  Working with Congress, the Administration sought and Congress enacted new authorities . . . [to make] funds available for assistance to the Government of Colombia for supporting Colombia's unified campaign against narcotics trafficking and U.S.-designated terrorist organizations." *A report to Congress on United States Policy Towards Colombia and Other Related Issues*, submitted to the Congress by the Secretary of State, United States Department of State (Feb. 3, 2003), available at http://www.state.gov/p/wha/rls/rpt/17140.htm.

[25] *See also In re Sinaltrainal Litig.*, No. 01-3208-CIV-Martinez-Banstra, at 23 (S.D. Fla. Sept. 29, 2006) ("The Eleventh Circuit's *Aldana* decision did not specifically address the ramifications of conspiracy precedent in the context of establishing vicarious liability under the ATCA."); *In re South African Apartheid Litig.*, 346 F. Supp. 2d 538, 551 (S.D.N.Y. 2004) (holding that corporations did not engage in state action under ATCA and recognizing that it was "mindful of the collateral consequences and possible foreign relations repercussions that would result from allowing courts in this country to hear suits for the aiding and abetting of violations of international norms across the globe").

which standing alone is sufficient to render a matter nonjusticiable based on the political question doctrine:  "[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question."  *Baker*, 369 U.S. at 217; *see also Kadic*, 70 F.3d at 249.

Application of at least the fourth and sixth *Baker* factors dictate dismissal of this action because judicial resolution of this matter inextricably involves a nonjusticiable political question. The fourth *Baker* factor requires this Court to consider whether it would be possible to resolve this case without expressing a lack of respect for the Executive's handling of foreign relations.[26] A finding by this Court that the paramilitaries are an arm of the Colombian government would be completely at odds with the position of the United States Department of State with regard to Colombia.  The United States recognizes the Republic of Colombia as a friendly government, one of the United States' strongest allies in Latin America, and has designated the United Self-Defense Forces of Colombia (AUC), the largest paramilitary organization in Colombia, as a foreign terrorist organization.[27]  Resolving any doubt regarding the Administration's position,

---

[26] *See Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1194 (C.D. Cal. 2005) (barring an action by Colombian citizens against oil company and private security firm under ATCA and TVPA under the fourth *Baker* factor, noting that "the Court pays particular attention to the fact that this case involves foreign relations, an area over which the Executive has a great deal of responsibility").

[27] United States Department of State, *Designation of the AUC As a Foreign Terrorist Organization*, available at www.state.gov/secretary/former/powell/remarks/2001/4852.htm; *see also* 70 Fed. Reg. 38316 (July 1, 2005).  This

Secretary Colin Powell stated that the United States "stand[s] with the Government of Colombia against the threats to its democracy from these terrorist groups."[28]   Congress authorizes aid for Colombia – on the basis of the State Department's annual certification that the nation's government respects human rights – in order to assist the Colombian government in combating terrorist groups such as the paramilitaries.[29]   A finding that the paramilitaries are an arm of Colombia's government would not only contradict the conclusions of the Executive and Legislative branches, but would constitute a finding that Colombia is a terrorist state.   Such a finding by this Court would clearly signal a lack of respect to both the Executive and Legislative Branches of our government which have a clear "policy toward Colombia support[ing] the Colombian Government's efforts  to . . . end the threats to democracy posed by . . . terrorism," which includes the paramilitaries.[30]

In effect, the maintenance of the lawsuit would require this Court to sit in judgment of the current Colombian government and United States foreign policy.   Such a judgment threatens serious potential embarrassment to the Executive Branch regarding its position towards the Colombian government's efforts to rid their country of the paramilitaries.   *See Linder v.*

---

Court may take judicial notice of legislative, executive and other public record materials on a motion to dismiss under Rule 12.  *See, e.g.*, *Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986); *In re Waterfront License Corp.*, 231 F.R.D. 693, 697 (S.D. Fla. 2005) ("[I]n ruling on a 12(b)(1) factual challenge to subject matter jurisdiction, the Court is free to consider extrinsic evidence outside the Complaint to determine its power to hear the case.").

[28] United States Department of State, *Designation of the AUC As a Foreign Terrorist Organization*, available at www.state.gov/secretary/former/powell/remarks/2001/4852.htm.

[29]  "On May 26, 2006, Secretary of State Condoleezza Rice determined and certified to the Congress that the Colombian government and armed forces are continuing to meet statutory criteria related to human rights and severing ties to paramilitary groups."   United States Department of State, *Colombia:  Determination and Certification of Colombian Government and Armed Forces with Respect to Human Rights Related Conditions* (May 30, 2006), available at http://www.state.gov/r/pa/prs/ps/2006/67066.htm; *see also State Department Releases 2005 Human Rights Country Reports*, available at http://usinfo.state.gov/dhr/Archive/2006/Mar/08-930887.html.

[30] Testimony Before the House of Representatives Committee on Government Reform, June 17, 2004 (Testimony of Roger F. Noriega, Assistant Secretary of the Bureau of Western Hemisphere Affairs, United States Department of State), available at http://www.state.gov/p/wha/rls/rm/33676.htm.

*Portocarrero*, 963 F.2d 332, 335 (11th Cir. 1992) (affirming dismissal based on the political question doctrine where resolution of the issues would have required "inquir[y] into the relationship between United States policy and the actions of the contra[s]").  A determination that the government of Colombia is supporting terrorism in its own country—an inevitable consequence if state action is found in this case—would have serious and far-reaching implications for the United States in the foreign relations arena and, thus, the Court should dismiss Plaintiffs' ATS and TVPA claims under the political question doctrine.

### IV.   THIS COURT DOES NOT HAVE JURISDICTION OVER THESE ANONYMOUS PLAINTIFFS

The Plaintiffs' Complaint must be dismissed because the Court lacks jurisdiction over it, because Plaintiffs filed it as anonymous "Doe" plaintiffs without requesting the district court's permission to do so.[31]  The "failure to seek permission to proceed under a pseudonym is fatal to an anonymous plaintiff's case because…federal courts lack jurisdiction over the unnamed parties, as a case has not been commenced with respect to them."  *Citizens for a Strong Ohio v. Marsh*, 123 Fed. Appx. 630, 637 (6th Cir. 2005); *Estate of Rodriguez v. Drummond Co., Inc.*, 256 F. Supp. 2d 1250, 1256 (N.D. Ala. 2003) (court dismissed all claims of unnamed plaintiffs who failed to seek leave to proceed anonymously because it had no "jurisdiction over the unnamed

---

[31] Not only have Plaintiffs failed to seek leave to proceed anonymously, Plaintiffs' identity is already known to the Defendants because the caption of the Complaint clearly indicates Plaintiffs' identifies as the heirs (wife, son and daughter, respectively) of Candido José Mendez.  Granting Plaintiffs' request to proceed anonymously now is pointless and unsupported by case law.  *See K.D. v. City of Norwalk*, 2006 WL 1662905, *2 (D. Conn. 2006) (despite plaintiff's allegations that she lived in "fear of reprisals" from defendants, court denied plaintiff's request for anonymity because the defendants already were aware of plaintiff's identity and therefore anonymous pleading would not "alleviate" plaintiff's fears); *Doe v. Beaumont Indep. Sch. Dist.*, 172 F.R.D. 215, 217 (E.D. Tex. 1997) (finding plaintiff's request for anonymity "pointless" because defendants already knew plaintiff's identity); *Raiser v. Church of Jesus Christ of Latter-Day Saints,* 182 Fed. Appx. 810, 811-12 (10th Cir. 2006) (where sensitive information has already been disclosed the "social interest in allowing a party to proceed anonymously is limited" and courts will not "put jack back in the box").

plaintiffs").   Therefore, all of Plaintiffs' claims must be dismissed because the Court lacks jurisdiction over these unnamed Plaintiffs.

In federal courts, parties must identify themselves in their pleadings to commence and maintain an action.   *See* Fed. R. Civ. P. 10(a) ("Every pleading shall contain a caption…includ[ing] the names of all the parties.").   The rule derives from basic notions of fairness and the Constitution's guarantee of open and public judicial proceedings.[32]   Only rarely, when presented with exceptional circumstances, will federal courts permit a party to proceed anonymously in litigation.  *See Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997) ("The use of fictitious names is disfavored, and the judge has an independent duty to determine whether exceptional circumstances justify such a departure from the normal method of proceeding in federal courts"); *W.N.J. v. Yocom*, 257 F.3d 1171, 1172 (10th Cir. 2001) ("Proceeding under a pseudonym in federal courts is, by all accounts, an unusual procedure").

Because no automatic right to proceed anonymously in federal courts exists, parties seeking the right to do so must file a request for leave from the court to proceed anonymously. *See Barth v. Kaye*, 178 F.R.D. 371, 376 (N.D.N.Y. 1998) ("If a party wishes to proceed under a fictitious name he must request the right to do so."); *W.N.J.*, 257 F.3d at 1172 ("When a party wishes to file a case anonymously or under a pseudonym, it must first petition the district court for permission to do so.")

Federal courts routinely dismiss all claims contained in a complaint where, as Plaintiffs have done here, plaintiff proceeds anonymously without first obtaining the permission of the

---

[32]   *See Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992) (the "mere filing of a civil action against other private parties may cause damage to their good names and reputation and may also result in economic harm . . . .   Basic fairness dictates that those among the defendants' accusers who wish to participate in this suit as individual party plaintiffs must do so under their real names."); *Doe v. Provident Life & Accident Ins. Co.*, 176 F.R.D. 464, 466-67 (E.D. Pa. 1997) ("The public right of access to civil judicial proceedings has as its bases, constitutional law, the common law, and public policy grounds.").

district court.  *See Nat'l Commodity & Barter Ass'n v. Gibbs*, 886 F.2d 1240, 1245 (10th Cir. 1989) (court dismissed complaint of unnamed plaintiffs who "made no request to the district court for permission to proceed anonymously"); *Estate of Rodriguez v. Drummond Co., Inc.*, 256 F. Supp. 2d 1250, 1256 (N.D. Ala. 2003) (court dismissed all claims asserted by unnamed plaintiffs who failed to seek leave to proceed anonymously); *W.N.J.*, 257 F.3d at 1171 (court held case "was improperly filed" and must be dismissed because plaintiffs "used pseudonyms without first obtaining permission from the district court").  Further, a *nunc pro tunc* order granting leave is not possible because the Court has no jurisdiction over Plaintiffs.  *See Estate of Rodriguez*, 256 F. Supp. at 1256 ("A lack of jurisdiction [as to unnamed plaintiffs] cannot be corrected by an order *nunc pro tunc*."); *W.N.J.*, 257 F.3d at 1172 (plaintiffs' securing of a *nunc pro tunc* order granting leave to proceed anonymously could not "cure the failure to secure permission at filing").[33]  Therefore, because Plaintiffs have filed their action anonymously without prior leave, the Court should dismiss the Complaint in its entirety.

## V.      ALL OF PLAINTIFFS' STATE LAW CLAIMS ARE TIME BARRED

Plaintiffs attempt to plead claims for wrongful death, assault, intentional infliction of emotional distress, and negligent supervision under Florida law.  *See* Compl. ¶¶ 57, 67, 73, 76. The applicable statute of limitations bars each of these claims.  Florida law provides a four year statute of limitations for claims of assault, intentional infliction of emotional distress, and negligent supervision, and a two year statute of limitations for wrongful death claims.  *See* § 95.11(3)(o), Fla. Stat. (2006) (four year statute of limitation for "an action for assault…or any other intentional tort"); § 95.11(3)(a), Fla. Stat. (2006) (four year statute of limitations for "an action founded on negligence"); *Ross v. Twenty-Four Collection, Inc.*, 617 So. 2d 428 (Fla. 3d

---

[33] *But see Doe v. Barrow County, Ga.*, 219 F.R.D. 189, 191-92 (N.D. Ga. 2003) (disagreeing with *Rodriguez* and distinguishing *Yocom* based on the procedural posture of that case).

DCA 1993) (holding four year statute of limitations barred plaintiff's claims for intentional infliction of emotional distress); § 95.11(4)(d), Fla. Stat. (2006) (two year statute of limitations for "an action for wrongful death").[34]

Plaintiffs allege that the events giving rise to each of these tort claims occurred on February 19, 2001, the date Mr. Mendez died. *See* Compl. ¶¶ 44-45. Therefore, Plaintiffs' claims for assault, intentional infliction of emotional distress, and negligent supervision were all barred as of February 19, 2005, and their claims for wrongful death were barred as of February 19, 2003. This action was filed on October 12, 2006, 20 and 44 months, respectively, after the expiration of applicable Florida statutes of limitations. On the face of the Complaint, Plaintiffs' Florida tort claims are clearly barred by the statute of limitations, and the Court should dismiss these claims with prejudice.[35] *See Waters v. Nu-Car Carriers, Inc.*, 500 So. 2d 224, 227 (Fla. 1st DCA 1986) (where facts demonstrating running of statute of limitations are "clearly and indisputably set forth on the face of the complaint…a motion to dismiss [should] be granted on this ground"); *Veltmann v. Walpole Pharmacy, Inc.*, 928 F. Supp. 1161, 1164 (M.D. Fla. 1996) ("Claims that are not filed before the running of the applicable limitations period are barred as a matter of law.").

Plaintiffs may not avoid application of the statute of limitations by simply alluding to Colombian or United States law, *see* Compl. ¶¶ 57 ("Defendants…committed acts that constitute

---

[34] Federal courts sitting in diversity apply the statute of limitations of the forum state. *See Eddings v. Volkswagenwerk*, 635 F. Supp. 45, 46 (N.D. Fla. 1986); *Reisman v. Gen. Motors Corp.*, 845 F.2d 289, 291 (11th Cir. 1988) ("Except in matters governed by the federal Constitution or by acts of Congress, federal courts in diversity cases must apply the law of the forum state, including its statute of limitations.").

[35] A district court may dismiss a claim with prejudice where the complaint clearly reveals the running of the applicable statute of limitations. *See Hart v. V.B. Invs., Inc.,* 2005 WL 1668540, *2 (M.D. Fla. 2005) ("Because it is apparent on the face of the complaint that the statute of limitations bars this claim…the complaint is due to be dismissed with prejudice."); *Callico v. City of Belleville*, 99 Fed. Appx. 746, 749 (7th Cir. 2004) (where everything plaintiff complained of occurred outside of the statute of limitations period, plaintiffs claims were "time-barred, and thus subject to dismissal with prejudice.").

wrongful death under the…laws of Colombia…"), 67 ("Defendants…committed acts that constitute assault…under the laws of Colombia…").  Plaintiffs' failure to cite any applicable Colombian law is an omission fatal to their claims.  *See Eschelbach v. CCF Charterhouse Credit Commercial de France*, 2006 WL 27094, *12-13 (S.D.N.Y. 2006) (court dismissed plaintiff's cause of action, which alleged only that defendants violated "French law," holding that party relying on foreign law must plead it in "sufficient detail that the court can determine its effect" and plaintiff failed to "point to any specific provision of French law"); *Heath v. Am. Sail Training Ass'n*, 644 F. Supp. 1459, 1471 (D.R.I. 1986) (dismissing wrongful death claim asserted under English law for failure to state a "specifically identified basis in foreign law");  *Adams v. Arabian Am. Oil Co.*, 1993 WL 384568, *3 (9th Cir. 1993) ("[P]laintiff who pleads foreign law must successfully persuade the court that he has a good cause of action").[36]

Similarly, Plaintiffs attempt to plead claims for relief "under the laws of the United States" for wrongful death, assault, and intentional infliction of emotional distress is unavailing.  *See* Compl. ¶¶ 57, 67, 73.  All three torts are state law torts and federal law does not recognize a cause of action for state law torts.  The United States Supreme Court has made clear that federal common law does not recognize causes of action for state law torts:  "There is, of course, no federal general common law . . .  [A]bsent some congressional authorization to formulate substantive rules of decision, federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international

---

[36] Alternatively, Plaintiffs purported Colombian law claims fail because, where a party fails to identify specifically the applicable foreign law, the court will assume the foreign law is identical to the law of the forum state.  *See Anderson v. McAllister Towing & Trans. Co., Inc.*, 17 F. Supp. 2d 1280, 1286 (S.D. Ala. 1998) (court applied Alabama law, rather than Saudi Arabian law, where defendants "asserted Saudi Arabian law without providing the court with any meaningful citation to Saudi Arabian case law or statute"); *Bethell v. Peace*, 441 F.2d 495, 497 (5th Cir. 1971) (where a party made no showing as to what the relevant foreign law was, the district court was entitled to assume the foreign law (Bahamian law) was the same as the law of the forum state (Florida)).  For the reasons set forth above in Part V., B., all of Plaintiffs' tort claims are time barred under Florida law.

disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640-41 (1981). *See also Turner v. Wilson Line of Mass.*, 242 F.2d 414, 418 (1st Cir. 1957) (dismissing plaintiff's cause of action for wrongful death arising under the "laws of the United States" because a wrongful death claim was not recognized at common law and plaintiff must, therefore, "look to some statute"; the only potentially applicable statute was a state wrongful death statute); *Jones v. Bernard*, 77 Fed. Appx. 467, 469 (10th Cir. 2003) (plaintiff's complaint, containing a generic tort claim against a fellow prison inmate for assault, "although not so pleaded…obviously arises under state law"); *Fountain v. New Orleans Pub. Serv., Inc.*, 265 F. Supp. 630, 633 (E.D. La. 1967) (despite plaintiffs' attempt to plead a wrongful death action arising under the "laws of the United States," court found federal question jurisdiction lacking because "Plaintiffs' cause of action…arises, not out of any Federal statute or constitutional provision, but under the Louisiana wrongful death statute.").  Therefore, under no jurisdiction's law upon which Plaintiffs rely have they stated a viable claim.

## VI.    UNDER FLORIDA LAW, PLAINTIFFS LACK STANDING TO ASSERT A WRONGFUL DEATH CLAIM

Plaintiffs have brought this action seeking recovery of civil damages as "immediate family members of and legal heirs to Candido José Mendez." Compl. ¶1.  The Complaint reveals that none of the Plaintiffs seek any recovery in this action as Mendez's personal representative. Accordingly, the Court should dismiss Plaintiffs' claim for wrongful death under Florida law because Florida's Wrongful Death Act provides *only* the decedent's personal representative with a right to pursue a wrongful death claim.

Section 768.20, Florida Statutes (1997), provides that a wrongful death action "*shall* be brought by the decedent's personal representative, who *shall* recover for the benefit of the

decedent's survivors and estate all damages" caused by the decedent's wrongful death. (emphasis added).  *See also Veltmann v. Walpole Pharmacy, Inc.*, 928 F. Supp. 1161, 1164 (M.D. Fla. 1996) ("[P]ersons other than the personal representative have no standing under Florida law to maintain" a wrongful death action); *Barfield v. Schmon*, 537 So. 2d 1056, 1057 (Fla. 4th DCA 1989) (Florida's Wrongful Death Act requires a decedent's personal representative to bring any wrongful death action "without any limiting language"); *Cabello Barrueto v. Fernandez Larios*, 205 F. Supp. 2d 1325, 1333-34 (S.D. Fla. 2002) (court dismissed all claims brought by the estate of a Chilean economist murdered by Chilean military officers "based on the Court's finding that both federal and Florida law contemplate that representatives bring lawsuits on behalf of estates").

Because Plaintiffs here seek recovery in their individual capacities, and not as personal representatives of the decedent's estate, each Plaintiff here lacks standing under Florida's Wrongful Death Act and the Court should dismiss these claims.  *See Veltmann*, 928 F. Supp. at 1164 (where decedent's family member survivors brought wrongful death action "in their individual capacities for their own benefit," and failed to allege they sought recovery as personal representatives of the decedent's estate, court dismissed wrongful death claims because plaintiffs were not "proper parties to this suit because they lack standing to bring a cause of action for wrongful death in their individual capacities"); *Beiswenger Enters. Corp. v. Carletta*, 86 F.3d 1032, 1041 (11th Cir. 1996) (Under Florida law, "[t]he beneficiaries of the estate, including the minor children, are not authorized to bring independent suits for their individual damages" but must share in any recovery obtained by the personal representative).

The Act's standing requirements were designed to prevent unfairness to defendants where, as here, the likelihood of multiple lawsuits and recoveries is substantial.  *See Ding v.*

*Jones*, 667 So. 2d 894, 897 (Fla. 2d DCA 1996) (purpose of personal representative requirement contained in current version of Florida's Wrongful Death Act is "to eliminate the multiplicity of suits that resulted from each survivor bringing an independent action" under the prior act); *Williams v. Infinity Ins. Co.*, 745 So. 2d 573, 576 (Fla. 5th DCA 1999) (Florida courts have "repeatedly noted" the personal representative requirement is intended to "eliminate the possibility of a multiplicity of suits and a race to judgment").  On information and belief, the decedent had at least three common law wives and five children.  Only one common law wife and two children are before the Court in this case.  Therefore, the likelihood of a multiplicity of suits against Defendants is substantial.[37]

## VII.   THE   COURT   LACKS   PERSONAL   JURISDICTION   OVER DRUMMOND LTD. AND VENUE IS IMPROPER

Drummond Ltd. lacks sufficient contacts with the State of Florida to support personal jurisdiction here.  Independently, personal jurisdiction does not obtain because service of process on Drummond Ltd. was insufficient.  Finally, venue is improper here.

### A.   Drummond Ltd.'s Contacts With Florida Are Insufficient To Subject It To The Personal Jurisdiction Of This Court

Plaintiffs bear the burden of demonstrating that jurisdiction is proper.  *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996).  A federal court may exercise personal jurisdiction over a nonresident defendant, such as Drummond Ltd., *only* to the extent permitted

---

[37] Plaintiffs' Florida state law tort claims for assault and negligent supervision are barred for the independent reason that these claims did not survive Mendez's death.  In both the assault and negligent supervision counts, Plaintiffs allege that "Defendants failed to use due care to protect [Mendez] from *injury and harm*, thereby directly and proximately causing *his injuries*." (emphasis added).  Compl. ¶¶ 68, 76.  "When a personal injury to the decedent results in death, no action for the personal injury shall survive, and any such action pending at the time of date shall abate."  *See* § 768.20, Fla. Stat. (1997).  *See also Knowles v. Beverly Enter.-Fla., Inc.*, 898 So. 2d 1, 9 (Fla. 2004) ("Under the Wrongful Death Act…a personal injury claim abates where personal injuries suffered from the negligent or wrongful act result in death."); *Taylor v. Orlando Clinic*, 555 So. 2d 876, 878 (Fla. 5th DCA 1989) (under Florida law, a wrongful death action accrues with the decedent's death, "which is the very event that extinguishes the personal injury cause of action…").  Because Plaintiffs' claims for assault and negligent supervision arise from the same events which directly caused the decedent's death, Florida's Wrongful Death Act bars the claims and the Court should dismiss them with prejudice.

by the forum state's long arm statute, and *only* if the exercise of the jurisdiction comports with the requirements of due process; *i.e.,* where minimum contacts exist between the defendant and the forum state, and jurisdiction is consistent with traditional notions of fair play and substantial justice. *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1552 (11th Cir. 1993); *Meterlogic, Inc. v. Copier Solutions, Inc.*, 126 F. Supp. 2d 1346, 1352 (S.D. Fla. 2000). Florida's long-arm statute must be "strictly construed." *Elite Aluminum Corp. v. Trout*, 451 F. Supp. 2d 1311, 1314 (S.D. Fla. 2006). The reach of Florida's long arm statute is a question of Florida law and, thus, federal courts are required to construe the long arm statute as would the Florida Supreme Court. *Meterlogic, Inc.*, 126 F. Supp. 2d at 1352.[38]

When personal jurisdiction is challenged by a defendant, the burden of proving facts showing jurisdiction to be proper under both the state long-arm statute and federal criteria rests directly upon the plaintiff, the very party who invoked the court's jurisdiction in the first place. *See Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, 701 F.2d 889, 891 (11th Cir. 1983). Under Florida law, a defendant may raise a meritorious challenge to personal jurisdiction through affidavits, documents or testimony. *Jet Charter Serv., Inc. v. Koeck*, 907 F. 2d 1110, 1112 (11th Cir. 1990). After such a challenge, the burden then falls on the plaintiff to prove that jurisdiction is proper. *Id.*; *Maschinenfabrik Seydelmann v. Altman*, 468 So. 2d 286, 288 (Fla. 2d DCA 1985). "The failure of a plaintiff to refute the allegations of the defendant's affidavit requires that a motion to dismiss be granted." *Wash. Capital Corp. v. Milandco, Ltd., Inc.*, 695 So. 2d 838, 841 (Fla. 4th DCA 1997).

---

[38] Plaintiffs have filed causes of actions against Drummond Ltd. pursuant to ATS, TVPA and state tort law. Compl. ¶¶ 2, 47-55, 60-65. Because ATS and TVPA do not contain a provision for service of process, the Court must examine Florida's long arm statute and Drummond Ltd.'s connection with Florida in determining whether personal jurisdiction exists. *See Elite Aluminum Corp.*, 451 F. Supp. 2d at 1314 ("When jurisdiction is based on a federal question arising under a statute that is silent regarding service of process, as it is here, Rule 4(e) of the Federal Rules of Civil Procedure requires that both assertion of jurisdiction and service of process be determined by the state long-arm statute.").

Plaintiffs' Complaint is devoid of any jurisdictional allegations to support a finding of personal jurisdiction over Drummond Ltd., *see* Compl. ¶¶ 9-11, which in itself mandates dismissal. *See Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989) ("In determining whether long-arm jurisdiction is appropriate in a given case . . . it must be determined that the complaint alleges *sufficient jurisdictional facts* to bring the action within the ambit of [Florida's long-arm] statute" and "sufficient minimum contacts . . . to satisfy due process requirements.") (emphasis added).

For this Court to exercise personal jurisdiction over non-resident Drummond Ltd. in this action, either specific or general personal jurisdiction must exist under Florida's long arm statute. *See Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291-92 (11th Cir. 2000).[39] The allegations in the Complaint against Drummond Ltd. do not arise out of any activities of Drummond Ltd. in Florida,[40] and therefore, the basis of this Court's exercise of personal jurisdiction, if any, must be under the "more stringent" standard of general jurisdiction, requiring a showing of "continuous and systematic general business contacts between the defendant and the forum state." *Consolidated Dev. Corp.*, 216 F.3d at 1292; § 48.193(2), Fla. Stat. (2006) ("substantial and not isolated activity").

To satisfy the "substantial and not isolated activity" requirement of the general jurisdiction statute, this Court must find that Drummond Ltd. "maintained 'continuous and systematic general business contacts' with the forum, so that it can properly be considered to be 'present' in the forum." *Am. Overseas Marine Corp. v. Patterson*, 632 So. 2d 1124, 1127-28 (Fla.

---

[39] Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint, while general jurisdiction arises from a defendant's contacts with the forum that are unrelated to the cause of action being litigated. *Id.*

[40] Plaintiffs allege that paramilitaries in Colombia murdered a union trade member in Colombia. There are no allegations in the Complaint that any activities by Drummond Ltd. in Florida are related to the events that occurred in Colombia.

1st DCA 1994) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 411-12 (1984)).  "[T]he facts required to assert . . . general jurisdiction must be 'extensive and pervasive.'"  *Id.* (citing *Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas*, 675 F.2d 587, 589 (3d Cir. 1982)).  As more fully discussed herein, Plaintiffs have failed to plead that the facts existing here sufficiently justify this Court's exercise of personal jurisdiction over Drummond Ltd.  Moreover, the attached Declaration of Curtis Jones settles any doubts that Drummond Ltd.'s contacts with Florida are insufficient for this Court to exercise personal jurisdiction over Drummond Ltd. in this action.

### 1. Drummond Ltd. Does Not Have The Requisite Minimum Contacts Needed To Warrant Exercising General Personal Jurisdiction.

Drummond Ltd. is an Alabama limited partnership that operates in Colombia.  *See* Jones Decl. ¶¶ 2-4.  Drummond Ltd. is not registered with the Florida Secretary of State to transact business in the State of Florida, and does not conduct or solicit any business in the State of Florida.  *See id.* ¶¶ 6-7.  It does not maintain any business office, agency or agents in the State of Florida,[41] and does not maintain any business records in the State of Florida.  *See id.* ¶8. Drummond Ltd. does not maintain any bank accounts in the State of Florida and has no telephone listings or mailing address in Florida. *See id.* ¶9.  Drummond Ltd. does not own or possess any real property in the State of Florida nor does it maintain any inventory or equipment

---

[41] Drummond Ltd. employs Holland & Knight LLP including lawyers in its Miami office as counsel for certain purposes.  But employment of counsel in the forum does not subject a defendant to general jurisdiction in that state. *See, e.g., Intec USA, LLC v. Engle*, 2005 WL 3619399, *5 (M.D.N.C. Sept. 8, 2005) (rejecting plaintiff's argument for asserting general jurisdiction over defendants based on defendants' retention of counsel in forum); *In re Ski Train Fire in Kaprun, Austria on November 11, 2000*, 2003 WL 1807148, *5 (S.D.N.Y. 2003) (holding that the retention of counsel in forum to assist with certain transactions will not suffice to subject corporation to general jurisdiction in that forum); *Glacier Refrigeration Serv., Inc. v. Am. Transp., Inc.*, 467 F. Supp. 1104, 1107 (E.D.N.Y. 1979) (holding that the fact that the corporation's attorney's office was in New York had no bearing on whether corporation was doing business in New York).

in Florida.  *See id.* ¶10.[42]  These factors are routinely considered by courts, and further establish that general jurisdiction should not be exercised over Drummond Ltd.  *See, e.g., Nippon Credit Bank, Ltd. v. Matthews*, 291 F.3d 738, 747 (11th Cir. 2002); *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055, 1057 (11th Cir. 1986).  Based on Drummond Ltd.'s lack of contacts with Florida, Drummond Ltd. has met its burden of showing that personal jurisdiction over Drummond Ltd. under Florida's long arm statute is not proper.

### 2.  Exercising Personal Jurisdiction Over Drummond Ltd. Does Not Comport With Constitutional Due Process Requirements.

Even where Florida's long arm statute applies- and it does not apply in this case-jurisdiction is improper unless it satisfies due process requirements.  *See Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F. Supp. 2d 1335, 1342 (S.D. Fla. 2002).  The determination whether personal jurisdiction over a nonresident defendant comports with due process is itself a two-pronged inquiry.  *Madara v. Hall*, 916 F.2d 1510, 1515-16 (11th Cir. 1990).  First, due process requires that an out-of-state corporation have sufficient minimum contacts with a state before that state may assert personal jurisdiction over such corporation, *id.* at 1516, and, second, the exercise of jurisdiction may "not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

---

[42] There are several engineering employees of Drummond Ltd. who maintain a residence in Florida and routinely travel at Drummond Ltd.'s expense from Florida to Colombia to perform work functions at the mine.  *See* Jones Decl. ¶ 11.  However, the personal decision of employees of a corporation to maintain a residence in Florida and a corporation providing travel arrangements for these employees are far from the type of "continuous and systematic" contacts with the forum required to establish presence in the forum.  *See Scherer v. Curators of the Univ. of Mo. & Law Sch. Admission Council*, 152 F. Supp. 2d 1278, 1284 (D. Kan. 2001) (holding that the mere fact that the defendant located in Missouri employed Kansas residents was insufficient to confer general jurisdiction over defendant in Kansas); *Gelineau v. N.Y. Univ. Hosp.*, 375 F. Supp. 661, 665 (D.N.J. 1974) (holding that some employees residing in New Jersey, in and of itself, does not mean that defendant does business in New Jersey, or wherever else its employees happen to reside); *see also Am. Overseas Marine Corp. v. Patterson*, 632 So. 2d 1124, 1127-28 (Fla. 1st DCA 1994) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 411-12 (1984)).

In this case, the minimum contacts requirement necessary to comply with due process cannot be established for the same reasons that Drummond Ltd.'s contacts are insufficient under Florida's long arm statute.  *See Baker v. Carnival Corp.*, 2006 WL 3360418, *2 (S.D. Fla. Nov. 20, 2006) (recognizing that the "substantial and not isolated activity" in Florida's long arm statute is the functional equivalent of the continuous and systematic contact requirement for general jurisdiction under the Due Process Clause of the Fourteenth Amendment); *see also Stubbs v. Wyndham Nassau Resort & Crystal Place Casino*, 447 F.3d 1357, 1363 n.7 (11th Cir. 2006). Drummond Ltd.'s contacts with Florida are virtually nonexistent – it is not registered to transact business in the State of Florida; does not conduct or solicit any business in Florida; does not maintain any business office, agency or agents in Florida; does not maintain any business records in the State of Florida; does not maintain any bank accounts in Florida; has no telephone listings or mailing address in Florida; does not own or possess any real property in Florida; and does not maintain any mining inventory or equipment in Florida.  *See* Jones Decl. ¶¶ 6-10.

The exercise of jurisdiction in this case would certainly offend traditional notions of fair play and substantial justice.   The alleged events giving rise to this action occurred in Colombia, Plaintiffs are residents of Colombia and the claims arose out of no activity of Drummond Ltd. (or anyone else) in Florida.  *See Kozial v. Bombardier-Rotax GmbH*, 129 Fed. Appx. 543, 547-48 (11th Cir. 2005) (holding that the exercise of general jurisdiction did not comport with traditional notions of fair play and substantial justice on contacts as attenuated as the contacts of the defendants with Florida where the accident occurred in New Jersey, the injured party was a New Jersey resident and the cause of action arose out of and was related to no activity of Defendants in Florida).   Florida has absolutely no interest in adjudicating this dispute arising from

allegations of events that occurred in a foreign country and involving foreign parties.[43]  Based on the stringent requirement Plaintiffs must meet to establish the existence of continuous and systematic contacts between Drummond Ltd. and Florida, Plaintiffs cannot establish a proper basis for this Court' s exercise of general jurisdiction over Drummond Ltd. that would not offend traditional notions of fair play and substantial justice.

      **3.**      **DCI's Contacts With Florida Cannot Be Imputed to Drummond Ltd. Based On Either An Agency Or Alter Ego Theory.**

Recognizing that Drummond Ltd. has no meaningful contacts with Florida, Plaintiffs advance a novel agency or alter-ego theory by which the Florida contacts of DCI, the alleged principal, would be imputed to Drummond Ltd., the alleged agent.  *See* Compl. ¶ 18 ("Defendant Drummond Ltd. is a wholly-owned, undercapitalized alter ego of [DCI]"); *id.* at ¶ 19 (referring to Drummond Ltd. as DCI's "alter ego and/or agent").  However, under an agency or alter ego theory, it is an agent's contacts with the forum that are imputed to a principal, not vice versa. *See, e.g., Johnson Enters. Of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1320 (11th Cir. 1998); *Meterlogic, Inc. v. Copier Solutions, Inc.*, 126 F. Supp. 2d 1346, 1357 (S.D. Fla. 2000).  Here, Plaintiffs ask the Court to impute the contacts with Florida of the alleged *principal*, DCI, to the alleged *agent*, Drummond Ltd., a nonresident Defendant with no meaningful contacts with Florida.  This theory turns the law of agency on its head.  Nonetheless, even if Plaintiffs' theory was plausible, Drummond Ltd. is neither the agent nor the alter ego of DCI.[44]

---

[43] That Drummond Ltd. has some scant, unrelated and attenuated contacts with Florida – providing travel arrangements for some of its engineering employees who reside in Florida – is insufficient to require Drummond Ltd. to defend itself in Florida against a claim that arises in another country and has no nexus to those Florida contacts. *See id.*

[44] The majority of the cases analyzing whether entities are in an agency relationship involve a parent and its subsidiary. *See, e.g., Vega Glen v. Club Mediterranee S.A.*, 359 F. Supp. 2d 1352, 1357 (S.D. Fla. 2005). These cases teach that "a mere parent-subsidiary corporate relationship . . . does not establish the necessary agency relationship." *John Scott, Inc. v. Munford, Inc.*, 670 F. Supp. 344, 345 (S.D. Fla. 1987). Thus, that Drummond Ltd. may be characterized as an indirect subsidiary of DCI is of no consequence to the Court's jurisdiction over Drummond Ltd.

Plaintiffs have done no more than assert in conclusory fashion that Drummond Ltd. is an agent that operates under the control of DCI. *See* Compl. ¶¶ 17, 19. In order to establish an agency relationship in Florida, Plaintiffs must show: "(1) acknowledgement by the principal that the agent will act for it; (2) the agent's acceptance of the undertaking; and (3) control by the principal over the actions of the agent." *Meterlogic, Inc. v. Copier Solutions, Inc.*, 126 F. Supp. 2d 1346, 1354 (S.D. Fla. 2000). For an agency relationship to exist in this case, the amount of control DCI exercises over Drummond Ltd. must be very significant, such that Drummond Ltd. manifests no separate corporate interests of its own and functions solely to achieve the purposes of DCI. *See Am. Tobacco Co.*, 707 So. 2d at 855; *see also Vega Glen v. Club Mediterranee S.A.*, 359 F. Supp. 2d 1352, 1357 (S.D. Fla. 2005).

The Declaration of Curtis Jones, Exhibit 1, establishes that DCI's control over Drummond Ltd. is far from sufficient to warrant this Court's exercise of personal jurisdiction over Drummond Ltd. on the basis of any contacts between DCI and the State of Florida. Specifically, Mr. Jones explains, among other things, that Drummond Ltd. is responsible for its own day-to-day activities and maintains separate records and accounts. Jones Decl. ¶ 12. These facts require a finding that no agency relationship exists between Drummond Ltd. and DCI on the basis of which jurisdiction over Drummond Ltd. could be based on contacts between DCI and Florida. *See, e.g., Enic, PLC v. F.F. South & Co., Inc.*, 870 So. 2d 888, 892 (Fla. 5th DCA 2004) (finding plaintiff could not establish sufficient control); *Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F. Supp. 2d 1335, 1344 (S.D. Fla. 2002) (finding no control even where one company conducted its business "under the watchful eye" of the other).[45]

---

[45] Drummond Ltd. has thus met its burden of demonstrating that Plaintiffs cannot avail themselves of the existence of an agency relationship to support an exercise of personal jurisdiction by this Court over Drummond Ltd. *See Meterlogic, Inc.*, 126 F. Supp. 2d at 1352 ("When a nonresident defendant meets this burden [of challenging the plaintiff's allegations by affidavits or other competent evidence], the plaintiff must substantiate the jurisdictional

Plaintiffs also assert an alternative alter ego theory.  They allege that Drummond Ltd. is a "wholly-owned, undercapitalized alter ego of [DCI] totally under the dominance and control of [DCI]" that "was created and exists purely to serve as an instrumentality for [DCI]."  Compl. ¶18.  To succeed on this theory, Plaintiffs must establish *not only* that Drummond Ltd. is a "mere instrumentality" of DCI *but also* that DCI engaged in "improper conduct" through its organization or use of Drummond Ltd.  *See Johnson Enters. Of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1320 (11th Cir. 1998) ("Improper conduct is present only in 'cases in which the corporation was a mere device or sham to accomplish some ulterior purpose . . . or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose.'") (quoting *Mayer v. Eastwood-Smith & Co.*, 164 So. 684, 687 (Fla. 1935)).

Plaintiffs have only stated bare and conclusory allegations that Drummond Ltd. was created to serve as an instrumentality for DCI "for the sole purpose of operating the Colombian mines for the sole benefit of [DCI]."  Compl. ¶ 17.   However, even if this Court accepts as true that Drummond Ltd. was created for the specific purpose of operating the mines in Colombia, as alleged by Plaintiffs, "there is nothing inherently improper about corporations creating subsidiaries to perform specific functions."  *Sun Trust Bank v. Sun Int'l Hotels Ltd.*, 184 F. Supp. 2d 1246, 1269 (S.D. Fla. 2001).  Moreover, contrary to Plaintiffs' assertions, the facts, set forth in Mr. Jones' Declaration, support this Court's finding that Drummond Ltd. and DCI are separate and distinct corporate entities with no misuse of the corporate form, as detailed in Part VII.A.1, above,[46] and that Drummond Ltd. is not the alter ego of DCI.  Based on the scant allegations

---

allegations in its complaint by affidavits, testimony or documents.").  *See also Abramson v. The Walt Disney Co.*, 132 Fed. Appx. 273, 276-77 (11th Cir. 2005) (finding no agency relationship where plaintiff failed to contradict affidavit evidence submitted by defendants that alleged agent was responsible for its own day-to-day activities and finances and maintained separate books, records and accounts).

[46] Drummond Ltd. maintains separate records and accounts, is responsible for its own day-to-day activities and maintains control over its own assets and operations which are not shared with DCI.  See Jones Decl. ¶ 10.; *see also Sun Trust Bank*, 184 F. Supp. 2d at 1268 (finding there was insufficient evidence to pierce the corporate veil where

stated in Plaintiffs' Complaint, which are refuted in Mr. Jones' Declaration, Drummond Ltd. is not subject to the Court's personal jurisdiction under theories of agency or alter ego.

**B.      Venue For Drummond Ltd. In Florida Is Improper Under 28 U.S.C. § 1391**

Plaintiffs err in alleging that venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c).  *See* Compl. ¶ 11.  Section 1391(b) provides that venue is proper in "(1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought."  28 U.S.C. § 1391(b).  Drummond Ltd. does not reside in this District.  Jones Decl. ¶¶ 6-10.[47]  A "substantial part of the events" giving rise to the Plaintiffs' claims certainly did not

there was no evidence of commingling of funds between corporations); *Hobbs v. Don Mealey Chevrolet, Inc.*, 642 So. 2d 1149, 1156 (Fla. 5th DCA 1994) (refusing to pierce the corporate veil where two corporate entities did not commingle funds, maintained separate bank accounts and transacted business in their own names).  Although Drummond Ltd and DCI share a business address in Birmingham and there is some overlap in officers and directors, the law is clear in Florida that even some overlap in officers and employees and the sharing of a business address is insufficient to pierce the corporate veil based on an alter ego theory.  *See, e.g.*, *Sun Trust Bank*, 184 F. Supp. 2d at 1268 ("[E]vidence of the sharing of a business address and some overlap of officers and employees between the entities . . . is insufficient to pierce the corporate veil."); *Meterlogic, Inc.*, 126 F. Supp. 2d at 1358 (holding that the overlap of officers is insufficient to support a finding that one corporate entity was the alter ego of another corporate entity).

[47] Section 1391(c) states that for purposes of venue, a defendant that is a corporation is deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced.  *See* 28 U.S.C. § 1391(c).  Drummond Ltd. is a limited liability partnership, which is treated as a corporation for purposes of determining venue.  *See Pippett v. Waterford Dev., LLC*, 166 F. Supp. 2d 233, 238 (E.D. Pa. 2001) (holding that a limited liability company, an unincorporated association similar to a partnership or limited partnership, has no citizenship independent of its members for determining jurisdiction, but for determining venue it is treated as a corporation); *Injection Research Specialists v. Polaris Indus., L.P.*, 759 F. Supp. 1511, 1514 (D. Colo. 1991) (holding that the propriety of venue in suit involving defendant limited partnership was required to be assessed under corporate venue standards under Section 1391(c)); *see also Denver & R.G.W.R. Co. v. Brotherhood of R.R. Trainmen*, 387 U.S. 556, 562 (1967).  Under § 1391(c), venue in this action against Drummond Ltd. lies in this District if Drummond Ltd. is subject to personal jurisdiction here.  Drummond Ltd., however, is not a resident of the Southern District of Florida for venue purposes because it is not subject to personal jurisdiction here:  It does not conduct business in the State of Florida and does not have an office in Florida.  Jones Decl. ¶¶ 7-8; *see also Algodonera De La Cabezas, S.A. v. Am. Suisse Capital, Inc.*, 432 F.3d 1343, 1345 (11th Cir. 2005) (holding that defendants were residents of the Southern District of Florida because both defendants conducted business through their offices in the Southern District, received correspondence there and were subject to service of process there).  Moreover, subsection (c) is inapplicable because there is another district in which this action may be brought.

occur in this District – the Complaint itself alleges that all the events occurred in Colombia. Compl. ¶¶ 2-3, 43-45.  Finally, the Complaint does not allege that any property in Florida is the subject of this action.  Because neither Section 1391(b) nor (c) supports a finding of proper venue for this action against Drummond Ltd., dismissal is warranted for improper venue.

## C.     Service of Process on Drummond Ltd. Was Insufficient

Insufficient service of process under Fed. R. Civ. P. 12(b)(5) is an independent ground for dismissal of Plaintiffs' Complaint against Drummond Ltd.  Plaintiffs listed both Drummond Ltd. and DCI on a single summons.  (D.E. 2).  Although a summons may bear the name of multiple defendants, a copy of the original summons must be served on *each* defendant identifying which defendant the copy applies to.   Fed. R. Civ. P. 4(b); *see also* Advisory Committee's Notes to 1993 Amendments to Fed. R. Civ. P. 4  ("If there are multiple defendants, the plaintiff may secure issuance of a summons for each defendant, or may serve copies of a single original bearing the names of multiple defendants if the addressee of the summons is effectively identified.").   In this case, however, only one summons was served on DCI for both Defendants.  Contrary to the specific requirements of Rule 4(b), Drummond Ltd. was not served with a copy of an original summons and, therefore, Plaintiffs' Complaint against Drummond Ltd. should be dismissed based on insufficiency of service of process.[48]

---

[48]  Plaintiffs may contend that service of process on DCI was sufficient service of process on Drummond Ltd. based on an agency theory.  As discussed in detail in Section I.C.1., above, an agency relationship does not exist between Drummond Ltd. and DCI.  Therefore, service of process on DCI was not sufficient service of process on Drummond Ltd. as required under the Federal Rules of Civil Procedure.  *See B.G. Wasden v. Yamaha Motor Co., Ltd.*, 131 F.R.D. 206, 209 (M.D. Fla. 1990) (holding that plaintiff did not show that parent exercised control over subsidiary sufficient to prove an agency relationship and show proper service of process).

**CONCLUSION**

For the foregoing reasons, the Court should enter an order dismissing Plaintiffs' Complaint in its entirety.

Respectfully submitted,

HOLLAND & KNIGHT LLP
*Attorneys for Defendants*
*Drummond Company, Inc.,*
*and Drummond Ltd.*
701 Brickell Avenue, Suite 3000
Miami, Florida 33131
Tel.: (305) 374-8500
Fax.: (305) 789-7799

By:  s/ Brett A. Barfield
George Menció, Jr. (FBN: 335861)
e-mail: george.mencio@hklaw.com
Adolfo E. Jiménez (FBN: 869295)
e-mail: adolfo.jimenez@hklaw.com
Brett A. Barfield (FBN: 192252)
e-mail: brett.barfield@hklaw.com
Martha R. Mora (FBN: 648205)
e-mail: martha.mora@hklaw.com

**Certificate of Service**

I hereby certify that on January 25, 2007, I electronically filed the foregoing Defendants' Unopposed Motion for Extension of Time to Serve Their Responses to Plaintiffs' Complaint with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Service List:

William J. Wichmann, Esq.
Conrad & Scherer, LLP
P. O. Box 14723
Fort Lauderdale, FL 33302
wjw@conradscherer.com
via electronic filing

# 4312013_v6