## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.  06-61527-CIV-DIMITROULEAS/SELTZER

| | |
|---|---|
| MARINA BARBOZA, on behalf of herself and as heir of the deceased, Candido Jose Mendez, MAIRA MARLENE MENDEZ BARBOZA, on behalf of herself and as heir of the deceased, Candido Jose Mendez, and RAFAEL MENDEZ BARBOZA, on behalf of himself and as heir of the deceased, Candido Jose Mendez, | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| DRUMMOND COMPANY, INC., and DRUMMOND LTD., | ) ) ) |
| Defendants. | ) |

## DEFENDANT DRUMMOND COMPANY, INC.'S  MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT
## AND
## INCORPORATED MEMORANDUM OF LAW

George Mencíó, Jr., Adolfo E. Jiménez,
Brett A. Barfield & Martha R. Mora
HOLLAND & KNIGHT LLP
Attorneys for Defendants
701 Brickell Avenue, Suite 3000
Miami, Florida 33131
Tel.: (305) 374-8500
Fax.: (305) 789-7799

Drummond Company, Inc. ("DCI"), pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure, moves the Court to enter an order dismissing Plaintiffs' First Amended Complaint ("Amended Complaint").

## INTRODUCTION AND BACKGROUND

In their Amended Complaint, Plaintiffs assert a single claim under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"), "for providing material support to a foreign terrorist organization resulting in death." Am. Compl. at 16. Plaintiffs' Amended Complaint is due to be dismissed because (1) Plaintiffs have failed to allege a "violation of the law of nations," a jurisdictional prerequisite for a claim under the ATS; and (2) resolution of this case inextricably involves a nonjusticiable political question.[1]

Plaintiffs allege that on February 18, 2001, Mr. Mendez was followed home from work by a truck "commonly used by paramilitary forces," and that the following morning he was called out of his home by thirty men, some "wearing paramilitary uniforms, some police uniforms, and others . . . civilian clothing." Am. Compl. ¶¶ 33, 34.[2] The men allegedly asked Mr. Mendez where he worked and, after he responded "at Drummond," the men shot and killed him while his family watched from inside the house. *Id.* ¶ 35. Plaintiffs allege that Defendants conspired with the paramilitaries who killed Mr. Mendez to further Defendants' business interests. *Id.* ¶ 19.

---

[1] Simultaneously with this Motion, Defendant Drummond Ltd. is also filing a motion to dismiss Plaintiffs' Amended Complaint on the grounds that (1) this inherently Colombian action belongs in Colombia under the doctrine of *forum non conveniens*; and (2) Drummond Ltd. has insufficient contacts with Florida to subject it to jurisdiction here, it was improperly served, and venue does not lie in this District over Drummond Ltd. DCI joins in and incorporates by reference Drummond Ltd.'s arguments as to *forum non conveniens* as further grounds for dismissal of the Amended Complaint.

[2] This purported connection between the Colombian government and the thirty individuals alleged in 2001 to be paramilitaries who killed Mr. Mendez is beyond attenuated.

**ARGUMENT**

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), is the most recent pronouncement by the Supreme Court on the narrowly circumscribed parameters of ATS jurisdiction.  There, the Court concluded that Congress enacted the ATS with the understanding that federal courts would use their common law powers to recognize causes of action for a "modest number of international law violations."  *Id.* at 724.  The Court held that federal courts should assert jurisdiction over only a "narrow class" of international law violations that are comparable to violations of norms "of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th century paradigms" upon which the statute was based.  *Id.* at 725.[3]  The Court stated that the ***scope*** of liability under the ATS is also circumscribed by well-defined international law norms.  *Id.* at 733 n.20.  The Court admonished the federal courts to exercise restraint and great caution in discovering new offenses beyond this "narrow class" of international law violations.  *Id.* at 727-29.

With *Sosa*'s limiting parameters as a backdrop, Plaintiffs' ATS claim must be dismissed based on numerous independent grounds, most fundamental of which is the absence of subject matter jurisdiction over Plaintiffs' claim.  They have failed to allege the threshold jurisdictional requirement of a violation of the law of nations.

I.    **THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE PLAINTIFFS' AMENDED COMPLAINT FAILS TO PLEAD A VIOLATION OF THE LAW OF NATIONS**

It is well-settled that adequately pleading a violation of the law of nations is a jurisdictional prerequisite under the ATS.  *See Filartiga v. Pena-Irala*, 630 F.2d 876, 887 (2d

---

[3] The Court recognized that "violation of safe conducts, infringement of the rights of ambassadors, and piracy" were the only causes of action recognized as violations of the law of nations when Congress enacted the ATS in 1789.  *Id.* at 724.

Cir. 1980) ("The paucity of suits successfully maintained under [the ATS] is readily attributable to the statute's requirement of alleging a 'violation of the law of nations' at the jurisdictional threshold.").  Plaintiffs' three bases for subject matter jurisdiction under the ATS are untenable because:  (1) Plaintiffs have not and cannot allege a violation of international law by solely relying on three United States laws, but no international sources of law; (2) to the extent they purport to continue to advance their novel state action theory based on the purported symbiotic relationship between the Defendants, the paramilitaries and the Colombian government, such an expansion of the scope of liability under the ATS is neither warranted nor adequately pled; and (3) reliance on the war crimes exception based on a mere reference to armed conflict is insufficient to satisfy the heightened pleading required to confer ATS jurisdiction on this Court.

A.      **Plaintiffs Cannot Establish A Violation Of The Law Of Nations By Merely Alleging The Violation Of United States Law Passed Under Article I, Section 8, Clause 10**

Plaintiffs, seemingly abandoning the untenable and novel theories of state action and war crimes of their original complaint to establish subject matter jurisdiction,[4] now advance yet another untested theory:  Defendants, they say, "knowingly provided material support [to] a known terrorist group by providing money, supplies, access, and other substantial assistance to the paramilitaries that resulted in the murder of Mendez."  Am. Compl. ¶ 39.  Plaintiffs cite only to the United States anti terrorism laws[5] found in the ATA, the AEDPA and the USA PATRIOT

---

[4] To the extent Plaintiffs' general allegations continue to implicate the Colombian government in the Mendez murder and refer to armed conflict to invoke the war crimes exception to the state action requirement, in an abundance of caution, we demonstrate in Part I.B that the scant remaining allegations are too vague and conclusory to withstand a motion to dismiss.

[5] After Congress repealed the Second Anti-Terrorism Act in its entirety in 1991, it reenacted the substantive portions in 1992.  Although the substance of the provisions remained virtually unchanged, the newly-enacted public law did not designate a short title, previously the Anti-Terrorism Act, for the collection of provisions.  The terrorism-related provisions, as reenacted, are codified in §§ 2331-2338 of chapter 113B of Title 18 of the U.S. Code (excluding sections 2332a-h) (hereinafter, the "ATA").  The remainder of the sections of Chapter 113B of Title 18 of the U.S. Code, §§ 2332a-h and §§ 2339-2339D, which also relate to terrorism, were enacted by various other laws, including the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and

Act (collectively, the "ATA"), contending that the provision of assistance to a terrorist organization alone establishes a violation of the law of nations, because, they assert, Congress passed the law against providing assistance to a known terrorist organization under its Constitutional Article I, Section 8, Clause 10 power to punish violations of the law of nations. Am. Compl. ¶ 40; U.S. Const., art. I, § 8, cl. 10.  But no court has ever so held and for several good reasons.

First, a violation of international law for ATS jurisdiction must be gleaned from international law, not merely United States law.  Second, terrorism, in general, has been repeatedly held not to be so well-defined and universally accepted as to rise to the level of a violation of the law of nations for ATS purposes.  Third, holding that any alleged violation of any law passed pursuant to Congress' Article I, Section 8, Clause 10 powers suffices to establish a "violation of the law of nations" for an ATS claim would vastly expand federal court jurisdiction over such claims.[6]

### 1.  A violation of the law of nations requires reference to international law.

Federal subject matter jurisdiction exists over an ATS claim when:  (1) an alien sues (2) for a tort (3) committed in violation of *international* law.  *See Aldana v. Del Monte Fresh*

---

Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub. L. No. 107-56, 115 Stat. 272 (2001).  *See Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, *6-7 (E.D.N.Y. 2007).

[6] In fact, Plaintiffs could not state a claim for an ATA violation because the ATA provides a cause of action only for United States nationals, *not foreign nationals*, who are injured by an act of international terrorism, which is defined as violent acts intended to intimidate or coerce a civilian population.  *See* 18 U.S.C. §§ 2331, 2333.  Besides being the wrong plaintiffs alleging the wrong conduct, an ATA action by Plaintiffs would be barred by the statute's four year limitations period.  *See* 18 U.S.C. § 2335.  Plaintiffs are thus relying on a law that, even if applicable, would bar their claim in this case.  *See also Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir. 2005) (allegations of systematic efforts against organized labor were "too tenuous" to satisfy "widespread or systematic attack against civilian populations" for crimes against humanity).  Moreover, the AUC, whose unidentified members allegedly shot and killed Mendez, was not designated a terrorist organization by the U.S. Secretary of State until September 2001, several months after Mendez's death.  *See Public Notice:  Designation of a Foreign Terrorist Organization*, 66 F.R. 47,054 (Sept. 10, 2001).

*Produce, N.A., Inc.*, 416 F.3d 1242, 1246 (11th Cir 2006) (citing *Abebe-Jira v. Negewo*, 72 F.3d 844, 848 (11th Cir. 1996)).  *See also* 28 U.S.C. § 1350 ("The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of ***the law of nations*** or a treaty of the United States) (emphasis added).   "Under the ATS, the 'law of nations' refers to a body of law known as customary international law."  *Saperstein v. Palestinian Auth.*, No. 1:04-cv-20225-PAS, 2006 WL 3804718, at *4 (S.D. Fla. Dec. 22, 2006) (citing *Flores v. S. Peru Copper Corp.*, 343 F.3d 140, 154 (2d Cir. 2003)).  "Conduct violates the 'law of the nations' if it contravenes 'well-established, universally recognized norms of international law.'"  *Id.* (citing *Kadic v. Karadzic*, 70 F.3d 232, 229 (2d Cir. 1995)).  Consequently, "it is not possible to claim that the practice or policies of any one country, ***including the United States***, has such authority that the contours of customary international law may be determined by reference only to that country . . . ."  *Flores*, 414 F.3d at 257, n.33 (emphasis added).  *See also U.S. v. Yousef*, 327 F.3d 56, 92 (2d Cir. 2003) (same); *Banco Nacional de Cuba v. Sabbatino*, 307 F.2d 845, 861 (2d Cir. 1962) (in defining customary international law, "one pitfall into which we could stumble would be the identification as a fundamental principle of international law of some principle which in truth is only an aspect of the public policy of our own nation and not a principle so cherished by other civilized peoples.").

Thus, the determination whether conduct alleged in an ATS claim is sufficiently egregious to constitute a violation of customary international law "is no simple feat."  *Saperstein*, 2006 WL 3804718, at *4.  "[I]t is 'discerned from myriad of decisions made in numerous and varied ***international and domestic*** arenas.'"  *Id.* (quoting *Flores*, 343 F.3d at 154).  *Cf., e.g., Kadic*, 70 F.3d at 241 (relying on The Convention on the Prevention and Punishment of the Crime of Genocide which expressly articulates the prohibition of genocide in international law);

*Filartiga*, 630 F.2d at 882-83 (relying on the United Nations' Declaration on the Protection of All Persons from Being Subjected to Torture as a definitive statement of norms of customary international law prohibiting torture); *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, **16-18, 21 (E.D.N.Y. 2007) (relying on the International Convention for the Suppression of Terrorists Bombings, the International Convention for the Suppression of the Financing of Terrorism and the United Nations' Security Counsel Resolution 1566).  Thus, Plaintiffs' reliance on only U.S. law and policy as reflected in the three anti-terrorism laws they cite is, as a matter of law, an insufficient basis on which to rest a finding of a violation of the "law of nations."

**2.  The conduct Plaintiffs allege does not establish a violation of international law.**

Plaintiffs' allegation that Defendants provided substantial assistance to a terrorist organization that resulted in a death cannot be said to constitute a violation of international law. Plaintiffs have not cited to a single source of international law establishing that the specific conduct alleged here is universally condemned and the cases disclose that no such norm of international law exists.  At least one court in this district, after surveying international law and case authority, has held that "terrorism" is not a specific and well-defined violation of international law.   *Saperstein*, 2006 WL 3804718, at *7.  Therefore, even construing as "terrorism" the killing of an employee allegedly to further the business interests of an American company, or allegedly providing material assistance for such conduct, Plaintiffs fail to plead a violation of the law of nations.  *See also Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 795 (D.C. Cir. 1984) (Edwards, J.) (concluding that terrorism has not reached the status of a violation of the law of nations).

One court recently found that very ***specific criminal conduct*** committed by a terrorist organization in violation of established multinational conventions, that is, the "organized,

systematic suicide bombings and other murderous attacks against innocent civilians for the purpose of intimidating a civilian population" did rise to the level of a violation of international law. *See Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007). In *Almog*, the district court for the Eastern District of New York found that such specific tortious conduct violated several **multinational** conventions and hence the law of nations.[7] But, no court has ever held that terrorism, in general, or supporting a terrorist organization alone, constitutes tortious conduct sufficient to establish a violation of the law of nations under the ATS.

### 3. Accepting Plaintiffs' novel theory would vastly expand the narrow parameters the Supreme Court established in *Sosa*.

To hold that a plaintiff may trigger ATS jurisdiction with the mere allegation of conduct proscribed in any law passed pursuant to Congress' Article 1, Section 8, Clause 10 powers to "define and punish . . . Offenses against the Law of Nations," would "be in direct contravention of the Supreme Court's specific prudential guidance admonishing lower courts to be cautious in creating new offenses under the law of nations." *Saperstein*, 2006 WL 3804718, at *8.[8] *Cf. Sosa*, 542 U.S. 732-33 ("[T]he determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the

---

[7] After finding that the specific underlying conduct constituted a violation of the law of nations, the *Almog* court turned to the question of whether the defendant, Arab Bank, could be held liable under the ATS under an aiding and abetting theory. *Id.* at *23. It was only after surveying additional sources of international law to conclude that Arab Bank could be held liable for financing the conduct alleged, that the court stated,

> In addition to these findings, Congress expressed that it was enacting its prohibition on material support to foreign terrorist organizations pursuant to its power under Article I, Section 8, Clause 10, of the U.S. Constitution, to 'define and punish . . . Offenses against the Law of Nations' and thus appears to have recognized that providing material support to a foreign terrorist organization is a violation of the law of nations. This provides further support that Arab Bank's conduct renders it liable under the ATS . . . ."

*Id.* at *29 (citations omitted). Thus, despite the expansive reading Plaintiffs would like to give this passage from *Almog*, the *Almog* court did not find that a violation of the ATA was a *per se* violation of the law of nations.

[8] As explained in Part I.B.2, the *Saperstein* court highlighted the flaws in the argument that the mere allegation that the murder of an innocent civilian during an armed conflict was sufficient for purposes of the ATS. The court observed that, if this were so, "then whenever an innocent person was murdered during an 'armed conflict' anywhere in the world . . . the federal courts would have subject matter jurisdiction over the dispute." 2006 WL 3804718, at *8.

*practical consequences* of making that cause available to litigants in the federal courts.") (emphasis added); *Saperstein*, 2006 WL 3804718, at *8 (weighing the "practical considerations" of suggested expansion of the law of nations). If any conduct proscribed in any law passed under Article I, Section 8, Clause 10 suffices to invoke federal court jurisdiction over an ATS claim, the number of violations of the law of nations and exceptions to the state action requirement would be vastly expanded.

Statutes enacted under Congress's Article I, Section 8, Clause 10 powers include such various laws as the following:

- Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1330;

- Act to Prevent and Punish the Counterfeiting of Notes, Bonds, and Other Securities of Foreign Governments, 18 U.S.C. § 482;

- Congressional Resolution Barring Protests in Front of Embassies, D.C. Code § 22-1115 (since repealed) (making unlawful the (1) display of any flag, banner, placard or device which would coerce, intimidate, or bring into public odium or disrepute any foreign government, party, or organization and (2) within 500 feet of any building within the District of Columbia that was used by a foreign government for official purposes);

- 18 U.S.C. § 1546 (criminalizing conduct, such as perjury and forgery, constituting a misuse of visas, permits and other entry documents);

- Act for the Punishment of Certain Crimes against the United States, Ch. IX, §§ 25-28, 1 Stat. 112-19 (1790) (criminalizing affronts to ambassadors and other public ministers and regulating safe-conduct and passports) (codified at 18 U.S.C. §§ 112, 541-546);

- The International Anti-Bribery Act and Fair Competition Act of 1998, 15 U.S.C. § 78dd-3 (an act greatly expanding the reach of the Foreign Corrupt Practices Act and generally prohibiting bribes to foreign public officials);

- Military Extraterritorial Jurisdiction Act of 2000, 18 U.S.C. § 3261-3267 (establishing Federal jurisdiction over felonies committed outside the United States by persons employed by or accompanied by the Armed Forces); and

- Submarine Cable Act, 47 U.S.C. §§ 21-39 (regulating and protecting the use of international telephone cables).

The practical consequences of holding that ATS jurisdiction obtains whenever plaintiffs allege conduct that any of these or other statutes passed under Article I, Section 8, Clause 10

proscribe are obvious; such a holding would expand ATS jurisdiction in the federal courts far beyond anything *Sosa* contemplated. *Cf. Aldana*, 416 F.3d at 1246-47 (finding that expanding liability for crimes against humanity to include systematic and widespread efforts against organized labor would contravene *Sosa*'s demand for "vigilant doorkeeping").

Plaintiffs here have failed to meet the threshold requirement of establishing, by reference to international law sources, a violation of the law of nations as to the underlying conduct, here the shooting and killing of a trade unionist by paramilitaries to further business interests. Plaintiffs have failed to meet this threshold requirement and the Court has no subject matter jurisdiction over their claim.

**B.   Plaintiffs Have Failed To Allege Sufficiently With Particularity State Action Or An Exception To The State Action Requirement.**

Unable to establish federal subject matter jurisdiction over their ATS claim based on their novel, expansive theory, Plaintiffs have also failed to plead facts that establish the requisite state action, or an exception to the state action requirement.[9]  As an initial matter, when evaluating whether the specific tortious conduct alleged in an ATS claim constitutes a violation of the law of nations, courts have applied a heightened pleading standard, engaging in a more searching preliminary review of the merits. *Kadic*, 70 F.3d at 238 ("[I]t is not a sufficient basis for jurisdiction to ***plead merely a colorable violation*** of the law of nations.") (emphasis added). *See also* In re S*inaltrainal Litig.*, No. 01-3208-CIV-Martinez-Banstra, 2006 WL 4061850, at *2 n.4

---

[9] Although Plaintiffs rely exclusively on their Article 1, Section 8, Clause 10 theory in their single count, *see* Am. Compl. ¶¶ 30-40, and appear to have abandoned their earlier state action and war crimes theories of jurisdiction, in an abundance of caution we address these theories because remnants of Plaintiffs' earlier allegations appear in their general allegations. *See* Am. Compl. ¶¶ 21, 23, 24, 26.  To the extent that Plaintiffs continue to rely on their novel theory of state action, this Court should decline to hear this matter for the reasons set forth in Part II regarding the political question doctrine.

(S.D. Fla. Sept. 29, 2006) ("*Sinaltrainal*") (dismissing action with prejudice for failure to plead state action with sufficient particularity).[10]

State action is a necessary element for claims under the ATS, *see Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir. 2005), unless the conduct falls within one of the recognized exceptions to the state action requirement.  *See Saperstein*, 2006 WL 3804718, at *6 ("certain conduct violates the law of nations whether committed by a state or a private actor, however, which conduct falls into this realm has not been completely defined").  Plaintiffs fail to plead adequately either state action or an applicable exception to that requirement.

**1.  Plaintiffs have failed to allege state action required by the ATS.**

The Court should reject Plaintiffs' novel theory of state action.  Even if the Court were to accept such a theory, Plaintiffs fail to plead state action with sufficient particularity.

**a.  Plaintiffs' state action theory impermissibly stretches the boundaries of color of law jurisprudence.**

Plaintiffs' claim under the ATS, Am. Compl. ¶¶ 2, 39-42, fails as a matter of law to assert a viable theory of state action.  Plaintiffs do not allege any direct involvement by a state actor in the shooting and killing of Mendez.  Instead, Plaintiffs allege that unidentified individuals, some of whom belonged to a terrorist organization, shot and killed Mendez.  Am. Compl. ¶¶ 31-35.  In their attempt to connect the paramilitaries to state actors, Plaintiffs make the conclusory allegation that the unknown and unnamed paramilitaries whom they claim killed Mendez enjoy a "symbiotic relationship" with the Colombian military, Am. Compl. ¶ 29**,** and thus, the actions of

---

[10] The Eleventh Circuit has not directly addressed the applicable pleading standard.  *Aldana* did not expressly discuss the heightened pleading standard applied by the district court in that case, 416 F.3d at 1253, but the court did not disturb the district court's application of a heightened pleading standard.  *See Sinaltrainal*, 2006 WL 4061850, at *25 (concluding that a heightened pleading standard applies to ATS claims and discussing *Aldana*).

paramilitaries constitute actions of the Colombian state.  Plaintiffs then posit that state action attaches to Defendants because Defendants allegedly conspired and acted jointly with the paramilitaries.  Am. Compl. ¶ 31.  Plaintiffs' state action theory constitutes an effort to create "state action" where none may be found as a matter of law.[11]

The majority of suits brought under the ATS resonate from a common chord:  they are actions against either named individuals who undoubtedly were themselves state actors, as officers or as agents of foreign political entities,[12] or private parties alleged to have engaged in joint action with acknowledged state actors.[13]  Unable to establish state action under one of these direct or joint action theories, Plaintiffs attempt to stretch ATS jurisdiction beyond these recognized and principled limits to include "a novel theory that 'color of law' can be imputed from complicity between state entities [i.e. the Colombian state] to paramilitaries, and in turn from paramilitaries to the Defendants in this case."  *Sinaltrainal*, 2006 WL 4061850, at *2 n.4.[14]  Such an enlargement of the concept of state action stretches the boundaries of "color of law" jurisprudence, and thus ATS jurisdiction, beyond any well-defined international law norm.  In *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 791 (D.C. Cir. 1984), Judge Edwards, concurring in the dismissal of an ATS claim, found that the Palestine Liberation Organization

---

[11] The Eleventh Circuit has closed the door on the notion that the actions of terrorists or other non-governmental armed groups, even when allegedly *tolerated* by the state, are "state actions" sufficient to support ATS jurisdiction. *Aldana*, 416 F.3d at 1248 (holding that Guatemala's registration and toleration of private security forces did not transform those forces' acts into state acts).

[12] *See, e.g., Abebe-Jira v. Negewo*, 72 F.3d 844 (11th Cir. 1996) (torture victims sued former chairman of Ethiopian governing unit alleged to have personally supervised and participated in acts of torture).

[13] *See, e.g., Sarei v. Rio Tinto, PLC.*, 456 F.3d 1069, 1078-79 (9th Cir. 2006) (defendant mining corporation allegedly participated with the army of Papua New Guinea in attacks on civilians); *Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) (defendant corporations alleged to have directed and aided the Nigerian Government's terror attacks).

[14] Plaintiffs in *Sinaltrainal* presented the same theory that Plaintiffs assert here.  Judge Martinez described this theory under which "'color of law' can be imputed from complicity between state entities to paramilitaries, and in turn from paramilitaries to the Defendants," as "unprecedented," "novel," and "untested in any federal court."  *Id.*

("PLO") was not a recognized member of the community of nations and thus did not act under color of any state's law.[15]  Judge Edwards declined to extend the definition of "state actor" under the law of nations "absent direction from the Supreme Court."  *Id.* at 792.  That direction came in *Sosa*.

*Sosa* held that "whether international law extends the scope of liability for a violation of a given norm" to the defendant being sued is a consideration related to the question of whether the international norm allegedly violated is "sufficiently definite to support a cause of action."  542 U.S. at 732-33 & n.20.  Following *Sosa*'s directive, some federal courts have reexamined the applicability of "color of law" jurisprudence in determining whether to extend liability under the ATS to non-state actors.  Finding that "the 'color of law' jurisprudence developed under § 1983 is not a well developed international norm," these courts have held its application to be an unwarranted expansion of the ATS's reach and inconsistent with the Supreme Court's "repeated calls for judicial restraint."  *Bowoto v. Chevron Corp.*, 2006 WL 2455752, at **6-7 (N.D. Cal. Aug. 22, 2006).  *See also Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 26 (D.D.C. 2005) ("Grafting § 1983 color of law analysis onto international law claims would be an end-run around the accepted principle that most violations of international law can be committed only by states.").[16]

---

[15] As noted earlier, under Eleventh Circuit precedent, the paramilitaries in this case are likewise not state actors for ATS jurisdictional analysis.  *Aldana*, 416 F.3d at 1248.

[16] In *Sinaltrainal*, Judge Martinez acknowledged but did not address this line of cases but, instead, concluded that the plaintiffs' allegations were "too conclusory, too vague, and too attenuated to adequately plead a violation of the law of nations."  *Sinaltrainal*, 2006 WL 4061850, at **4, 25, 33.  We acknowledge that the Eleventh Circuit recently stated that courts look to "principles of agency law and to jurisprudence under 42 U.S.C. § 1983" in construing the state action requirement of the ATS.  *Aldana*, 416 F.3d at 1247.  However, the court did not discuss— and it appears the parties did not raise—the effect of *Sosa* on the continuing validity of color of law analysis after *Sosa*.  In fact, in support of the proposition that principles of § 1983 guide the state action inquiry, the court cited *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995), a case that predates *Sosa* by some nine years.  Moreover, *Aldana* involved the well-recognized variety of vicarious liability, in which a private party is alleged to have acted ***directly*** with a state actor.  *See Aldana*, 416 F.3d at 1250 (private company alleged to be liable for the violent acts of police

Here, as we have noted, Defendants are not alleged to have acted jointly with state actors, but with paramilitaries who, like the PLO in *Tel-Oren*, are clearly not state actors. There is **no** authority for stretching the color of law analysis, as Plaintiffs urge here, to attach ATS liability to a private actor (Drummond Ltd.) alleged to have acted jointly with another **non**-state actor (the paramilitaries) alleged, in turn, to have acted with support from a state actor (the Colombian military). There is no justifiable reason for this Court to expand the reach of the ATS beyond the well-defined paradigms recognized in *Sosa* by expanding the definition of a state actor in order to create a new theory of liability under the law of nations. This Court should decline to accept the Plaintiffs' invitation to fling open the door that *Sosa* left barely ajar. *Sosa*, 542 U.S. at 727-29.

**b. Plaintiffs have failed to plead state action with particularity.**

Even if the Court were to find Plaintiffs' state action theory viable, Plaintiffs certainly have not met the heightened pleading standard required for ATS cases to establish a court's jurisdiction. *See Sinaltrainal*, 2006 WL 4061850, at *13. In *Sinaltrainal*, Judge Martinez dismissed several complaints with prejudice, finding that allegations, like Plaintiffs here, tying Colombian paramilitaries to corporate defendants were insufficient to establish federal court jurisdiction.[17] The court concluded that the plaintiffs' allegations "lack[ed] sufficient specificity" to plead a violation of the law of nations because the plaintiffs failed to tie the actions of the

---

officers and government officials). *Aldana* thus does not mandate that the Court find here that Plaintiffs have sufficiently pled state action. As Judge Martinez observed, the Eleventh Circuit has not squarely addressed the arguments made in the line of post-*Sosa* cases rejecting color of law jurisprudence as insufficiently defined in international law. *Sinaltrainal*, 2006 WL 4061850, at *29 n.26.

[17] *Compare Sinaltrainal*, Gil Compl. ¶ 38 ("The paramilitaries that Mosquera conspired with were . . . functioning openly in Carepa out of the military based . . . and were supported by and received cooperation from the military and police forces in the area such that the paramilitaries were in a symbiotic relationship with the military and police forces in the area.") *with* Am. Compl. ¶ 29 ("These AUC paramilitaries are permitted to operate openly in and around the Drummond facilities in Colombia because they are in a cooperative and symbiotic relationship with the regular military . . . .").

paramilitaries to the corporate defendants." *Id.* at *13. Here, Plaintiffs have failed to provide with sufficient particularity the details regarding the alleged conspiracy to kill Mendez, including the names of the paramilitaries who committed the alleged acts. *See* Am. Compl. ¶¶ 31, 34-35**.**

Plaintiffs' allegations in their Amended Complaint are even less specific than the allegations the court in *Sinaltrainal* found to be "too conclusory, too vague, and too attenuated to adequately plead a violation of the law of nations to support subject matter jurisdiction." *Id.* at **2, 22, 25, 27.[18] For example, Plaintiffs allege that some of the unknown paramilitaries who allegedly killed Mendez wore "***police*** uniforms." *Id.* ¶ 34. Yet, nowhere in their Amended Complaint do Plaintiffs allege any relationship between the paramilitaries and the Colombian ***police***. While Plaintiffs' Amended Complaint details a terrible act, allegations of the "who, what, where and when" of the relationship between Defendants, the paramilitaries, and Mendez's death are scant, and insufficient to satisfy the ATS's heightened pleading standard. Plaintiffs' allegations are the type of "murky allegations" that the court in *Sinaltrainal* concluded were insufficient to satisfy the "heightened standard of pleadings [that] is required under the ATCA." *Id.* at *21. Plaintiffs have asserted no more than a colorable relationship between Defendants, the paramilitaries, and the Colombian government, which is an insufficient basis for ATS jurisdiction.

### 2.   Any continued reliance on the war crimes exception is fruitless.

Tortious conduct held to be so well defined, specific and universally acknowledged in international law to support ATS jurisdiction even when perpetrated by a non-state actor includes

---

[18] Similarly, in *Sinatrainal* the court noted that in the complaints the "paramilitaries are not identified by name, nor in terms of specific affiliation (i.e. affiliation with the AUC, etc.), there are no dates or locations regarding the formation of the conspiracy, there is no description of the terms of the conspiracy, and there are not facts whatsoever that indicate that Mosquera was acting as an agent of Bebidas [bottling plant] when he conspired with the paramilitaries . . . allegations are vague as to the mechanics of how the members of the conspiracy had communicated or otherwise arranged to orchestrate the steps of the conspiracy." *Id.* at **18-19.

such atrocities as genocide, piracy, slave trading, aircraft hijacking, and war crimes.  *See Kadic v. Karadzic*, 70 F.3d 232, 240-43 (2d Cir. 1995).  In their initial pleading, Plaintiffs made reference to war crimes, but in their Amended Complaint make only one vague mention of "the armed conflict in Colombia."  Am. Compl. ¶ 26.  Although Plaintiffs appear to have abandoned their war crimes theory, in an abundance of caution we demonstrate that any continued reliance on the war crimes exception is futile.[19]

Judge Martinez's recent opinion in *Sinaltrainal* thoroughly analyzed the application of the war crimes exception to the state action requirement in reviewing allegations identical in all relevant respects to those in the present case.  His decision turned on *Kadic's* requirement that the crime occur ***in furtherance of*** the alleged ***armed conflict***, and he concluded that the war crimes exception could not apply.  Judge Martinez found that, where, as in this case, the plaintiffs alleged that the torts occurred in furtherance of ***business*** interests, and not in furtherance of the alleged war hostilities, the exception is not available.[20]  Judge Martinez's understanding of the narrowness of the war crimes exception is echoed in the recent well-reasoned opinion from Judge Seitz in *Saperstein v. Palestinian Auth.*, No. 1:04-cv-20225-PAS, 2006 WL 3804718, at *8 (S.D. Fla. Dec. 22, 2006).  The court summarized the plaintiffs' argument and found it entirely fallacious:

> Plaintiffs . . . characteriz[e] the allegations in the [third amended complaint] as a 'murder of a civilian in the course of an armed conflict,' or a war crime.  In doing

---

[19] Moreover, Plaintiffs have failed to plead the war crimes exception with sufficient particularity.  *Cf. Sinaltrainal*, 2006 WL 4061850, at *15 ("A thorough analysis of the operative complaints . . . demonstrates that Plaintiffs have failed to adequately plead facts that could give rise to either war crimes, genocide, or crimes against humanity under the necessarily heightened pleading standard required under the ATCA.").

[20] Judge Martinez rejected the argument that plaintiffs' allegation that defendants "affirmatively acted to benefit from the civil war by making arrangements to have the paramilitaries target their union leaders" to "further their business interests" rose to the level of the universal offenses condemned in *Kadic*.  *Sinaltrainal*, 2006 WL 4061850, at *15.

> this, Plaintiffs are grasping at the *Kadic* decision and attempting to bring the alleged conduct within the language of Common Article 3.  . . .  Plaintiffs then make the overreaching leap by stating that if the conduct falls within Common Article 3 and is prohibited thereby, then they have sufficiently alleged a violation of the law of nations for purposes of the ATS.  Essentially, Plaintiffs are saying that if they allege a murder of an innocent person during an armed conflict, then they have alleged a per se violation of the law of nations and federal courts have subject matter jurisdiction over the dispute under the ATS.  No court has so held.

*Id.*

Judge Seitz concluded that the *Kadic* court "did not make a blanket holding that any alleged violation of Common Article 3 would be sufficient for the purposes of the ATS." *Id.* Judge Seitz went further and identified "practical considerations" under the standards set forth in *Sosa* including that if the mere allegation that the murder of an innocent civilian during an armed conflict was sufficient for purposes of the ATS, "then whenever an innocent person was murdered during an 'armed conflict' anywhere in the world . . . the federal courts would have subject matter jurisdiction over the dispute." *Saperstein*, 2006 WL 3804718, at *8.  In summary, Plaintiffs have abandoned any argument that the war crimes exception applies.  Even if they had not, under the reasoning articulated both by Judge Martinez in *Sinaltrainal* and by Judge Seitz in *Saperstein,* Plaintiffs' allegations simply do not satisfy the war crimes exception to the state action requirement.

Because Plaintiffs have failed to allege with the requisite particularity either state action in the shooting and killing of Mendez or any of the narrow exceptions to the state action requirement, Plaintiffs have failed to establish the threshold requirement for subject matter jurisdiction over their ATS claim and the Court should dismiss the Amended Complaint with prejudice.

## II.   RESOLUTION OF THIS CASE INEXTRICABLY INVOLVES A NONJUSTICIABLE POLITICAL QUESTION

To the extent that Plaintiffs continue to rely on their novel state action theory, and the Court could entertain this suit, it should exercise its discretion and dismiss Plaintiffs' suit because it presents a nonjusticiable political question.  In *Sosa*, the Supreme Court warned that "attempts by federal courts to craft remedies for the violations of new norms of international law would raise risks of adverse foreign policy consequences, they should be undertaken, if at all, with great caution."  *Id.* at 727-28.  The government of Colombia is friendly to the United States, and the United States government has called Colombia "one of the United States' closest allies in this hemisphere, and our partner in the vital struggles against terrorism . . . ."  Supplemental Statement of Interest of the United States, *Mujica v. Occidental Petroleum Corp., Inc.*, No. CV03-2860-WJR(JWJx) (Jan. 5, 2005) (attached as Exhibit A).[21]  The Colombian government receives millions of dollars in aid from the United States to use in its effort to eradicate the paramilitaries, pursuant to findings of the Executive and Legislative Branches of the United States government that the Colombian government respects human rights and is actively attempting to eliminate the paramilitaries.[22]  For this Court to hold, as Plaintiffs ask, that the Colombian government in fact created the paramilitaries, and acts in collusion with them – a finding this Court would have to make to allow this action to proceed based on Plaintiffs' novel

---

[21] *See also Remarks on the Future of U.S. Policy in Colombia For the Inter-American Dialogue*, R. Nicholas Burns, Under Secretary for Political Affairs, United States Department of State (Aug. 3, 2005), available at http://www.state.gov/p/us/rm/2005/50728.htm ("[The] United States has a very close partner in Colombia . . . .  We have no better partner in Latin America. . . .  President Uribe is one of our strongest allies, and U.S. support . . . has enabled the Uribe government to continue to make great strides against narcotraffickers and terrorists.").

[22] "The United States strongly supported Plan Colombia's objectives . . . with a $1.3 billion assistance program enacted in July 2000. . . .  Working with Congress, the Administration sought and Congress enacted new authorities . . . [to make] funds available for assistance to the Government of Colombia for supporting Colombia's unified campaign against narcotics trafficking and U.S.-designated terrorist organizations." *A Report to Congress on United States Policy Towards Colombia and Other Related Issues*, submitted to the Congress by the Secretary of State, United States Department of State (Feb. 3, 2003), available at http://www.state.gov/p/wha/rls/rpt/17140.htm.

theory – would be directly contrary to the findings of both the State Department and Congress. This is precisely the type of case in which Sosa warned courts to exercise restraint because of the serious "collateral consequences" and "potential implications for the foreign relations of the United States."   *Sosa*, 542 U.S. at 727-28 (cautioning that collateral consequences is itself a reason for a high bar to new private causes of action for violating international law).[23]

The high risk of collateral consequences and foreign relations repercussions accompanying this action resolves any doubt that this matter is nonjusticiable.   "The nonjusticiability of a political   question is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962).   In *Baker*, the Court recognized six factors, any one of which standing alone is sufficient to render a matter nonjusticiable based on the political question doctrine.[24]

Application of at least two of the six *Baker* factors dictate dismissal of this action because judicial resolution of this matter inextricably involves a nonjusticiable political question.   The fourth *Baker* factor requires this Court to consider whether it would be possible to resolve this case without expressing a lack of respect for the Executive's handling of foreign relations.[25]   A

---

[23] *See also Sinaltrainal*, 2006 WL 4061850, at 23 ("The Eleventh Circuit's *Aldana* decision did not specifically address the ramifications of conspiracy precedent in the context of establishing vicarious liability under the [ATS]."); *In re South African Apartheid Litig.*, 346 F. Supp. 2d 538, 551 (S.D.N.Y. 2004) (holding that corporations did not engage in state action under the ATS and recognizing that it was "mindful of the collateral consequences and possible foreign relations repercussions that would result from allowing courts in this country to hear suits for the aiding and abetting of violations of international norms across the globe").

[24] The *Baker* factors include: "[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217; *see also Kadic*, 70 F.3d at 249.

[25] *See Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1194 (C.D. Cal. 2005) (barring an action by Colombian citizens against oil company and private security firm under the ATS under the fourth *Baker* factor, noting that "the court pays particular attention to the fact that this case involves foreign relations, an area over which the Executive has a great deal of responsibility").

finding by this Court that the paramilitaries are an arm of the Colombian government would be completely at odds with the position of the United States Department of State with regard to Colombia.  The United States recognizes the Republic of Colombia as a friendly government, one of the United States' strongest allies in Latin America, and has designated the United Self-Defense Forces of Colombia (AUC), the largest paramilitary organization in Colombia, as a foreign terrorist organization.  Resolving any doubt regarding the Administration's position, Secretary Colin Powell stated that the United States "stand[s] with the Government of Colombia against the threats to its democracy from these terrorist groups."[26]  A finding that the paramilitaries are an arm of Colombia's government would not only contradict the conclusions of the Executive and Legislative branches, but would constitute a finding that Colombia is a terrorist state.  Such a finding by this Court would clearly signal a lack of respect to both the Executive and Legislative Branches of our government which have a clear "policy toward Colombia support[ing] the Colombian Government's efforts  to . . . end the threats to democracy posed by . . . terrorism," which includes the paramilitaries.[27]

In effect, the maintenance of the lawsuit would require this Court to sit in judgment of the current Colombian government and United States foreign policy.  Such a judgment threatens serious potential embarrassment to the Executive Branch regarding its position towards the Colombian government's efforts to rid their country of the paramilitaries.  *See Linder v.*

---

[26] United States Department of State, *Designation of the AUC As a Foreign Terrorist Organization*, available at www.state.gov/secretary/former/powell/remarks/2001/4852.htm; *see also* 70 Fed. Reg. 38316 (July 1, 2005).  This Court may take judicial notice of legislative, executive and other public record materials on a motion to dismiss under Rule 12.  *See, e.g.*, *Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986); *In re Waterfront License Corp.*, 231 F.R.D. 693, 697 (S.D. Fla. 2005) ("[I]n ruling on a 12(b)(1) factual challenge to subject matter jurisdiction, the Court is free to consider extrinsic evidence outside the Complaint to determine its power to hear the case.").

[27] Testimony Before the House of Representatives Committee on Government Reform, June 17, 2004 (Testimony of Roger F. Noriega, Assistant Secretary of the Bureau of Western Hemisphere Affairs, United States Department of State), available at http://www.state.gov/p/wha/rls/rm/33676.htm.

*Portocarrero*, 963 F.2d 332, 335 (11th Cir. 1992) (affirming dismissal based on the political question doctrine where resolution of the issues would have required "inquir[y] into the relationship between United States policy and the actions of the contra[s]").  A determination that the government of Colombia is supporting terrorism in its own country—an inevitable consequence if state action is found in this case—would have serious and far-reaching implications for the United States in the foreign relations arena and, thus, the Court should dismiss Plaintiffs' ATS claim under the political question doctrine.

**CONCLUSION**

For the foregoing reasons, the Court should enter an order dismissing Plaintiffs' First Amended Complaint.

Respectfully submitted,

HOLLAND & KNIGHT LLP
Attorneys for Defendant Drummond Co., Inc.,
701 Brickell Avenue, Suite 3000
Miami, Florida 33131
Tel.: (305) 374-8500
Fax.: (305) 789-7799

By:  s/ Brett A. Barfield
George Menció, Jr. (FBN: 335861)
e-mail: george.mencio@hklaw.com
Adolfo E. Jiménez (FBN: 869295)
e-mail: adolfo.jimenez@hklaw.com
Brett A. Barfield (FBN: 192252)
e-mail: brett.barfield@hklaw.com
Martha R. Mora (FBN: 648205)
e-mail: martha.mora@hklaw.com

**Certificate of Service**

I hereby certify that on April 5, 2007, I electronically filed the foregoing Defendant Drummond Company, Inc.'s Motion to Dismiss Plaintiffs' Amended Complaint with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Service List:

William J. Wichmann, Esq.
Conrad & Scherer, LLP
P. O. Box 14723
Fort Lauderdale, FL 33302
wjw@conradscherer.com
via electronic filing

# 4464318_v1

21